Opinion issued July 11, 2013



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-12-00372-CV

————————————

**KTRK TELEVISION, INC., Appellant**

**V.**

**THEAOLA ROBINSON, Appellee**

On Appeal from the 234th District Court
Harris County, Texas
Trial Court Case No. 2011-54895

## OPINION

Following a series of news reports by KTRK Television, Inc. alleging financial mismanagement, Benji's Special Education Academy ("BSEA"), a charter school, and Theaola Robinson sued KTRK. KTRK moved to dismiss the action pursuant to the then-recently enacted Texas Citizens Participation Act

("TCPA").[1]  In a written order, the trial court denied the motion.  In five issues, KTRK contends that the trial court erred in denying KTRK's motion to dismiss.  In her brief, the school's former director and superintendent, Robinson, also challenges this Court's jurisdiction to consider KTRK's appeal.[2]  We hold that we have jurisdiction over this appeal, that the trial court erred by denying KTRK's motion to dismiss, and we reverse.

## Background

### A. The Charter School

In May 1980, Robinson founded BSEA, a non-profit corporation, to provide a day care and education for special needs children ("Benji's").  In November 1998, the Texas State Board of Education ("SBOE") granted BSEA a charter to operate Benji's as an open-enrollment, publicly funded pre-K through twelfth grade charter school.[3]  As such, compliance with the laws governing public schools was required.

---

[1]  *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 27.001-.011 (West Supp. 2012).

[2]  BSEA is no longer a party to this case.

[3]  The original plaintiffs in this suit were BSEA, the non-profit corporation that ran the charter school, and Robinson.  Although both the school and the corporation use the name "Benji's" or "Benji's Special Education Academy," Benji's (the school) was never a plaintiff.  Robinson amended her petition and dropped BSEA from the case, leaving Robinson as the sole plaintiff.  As a result, Robinson is the sole appellee.

2

By the mid-2000s, Benji's enrollment had increased nearly five-fold and, on behalf of BSEA, Robinson applied for a renewal of the charter to the Texas Education Agency ("TEA") in April 2003. The TEA refused action on the application, however, pending resolution of BSEA's growing list of problems. Indeed, five years later, the renewal application was still pending and, in December 2008, the TEA informed Robinson that it would remain pending until resolution of BSEA's problems in the following areas: financial management, academic performance, performance-based monitoring activities, audit requirements, and special education laws and policies.

By letter dated July 8, 2010, TEA Commissioner Robert Scott notified Robinson that in light of longstanding academic, governance, and financial concerns, and despite numerous agency investigations and interventions, the TEA intended to appoint a Board of Managers and a new Superintendent for the school. Following a hearing on August 19, 2010, Robinson and Benji's board of directors were notified on September 3, 2010, that the TEA would proceed to appoint a Board of Managers and Superintendent, which appointments effectively suspended any and all prior grants of authority to the former board of directors and Robinson.

On September 16, 2010, after the TEA had learned of the extent of the financial problems at Benji's, it issued an Order Suspending Charter Operations and Funds, stating, in relevant part, as follows:

3

[The urgent financial conditions at Benji's were not] known either to the board of managers or to the new superintendent when they met on September 6, 2010. Rather, the information leading to the conclusion that an urgent financial condition may exist at the charter school was disclosed by painstaking effort to assemble and evaluate information that had not been viewed by the former administration as indicating such a conclusion. Subsequent events have made plain that the former administration continues to maintain that there was and is no urgent financial condition presented by these facts.

The newly appointed Superintendent advised the parents by letter of the immediate suspension of the school's operations. The letter cited the school's critical cash flow problem, which included a virtually depleted bank account and numerous outstanding debts (including one to the Internal Revenue Service), as the reason that "the school cannot continue to operate as it does not have the necessary funds to pay its staff members or meet its current financial obligations."

Despite having been relieved of her duties as superintendent, Robinson directed staff to continue reporting to work as usual and asked parents to continue sending their children to school. Robinson also conducted a televised press conference at which she stated that she would not allow the new superintendent to carry out the TEA's decision and that the school would remain open despite the board's decision. Notwithstanding the State-mandated closure, on September 15, 2010, Robinson re-opened Benji's as an unaccredited private school using the same public school property and buses.

4

The next day, TEA Commissioner Scott ordered the immediate suspension of all of Benji's funding as well as its open-enrollment charter. Commissioner Scott subsequently sent a letter to Robinson and BSEA's board outlining the various grounds for revoking Benji's charter, including its "failure to satisfy generally accepted accounting standards of fiscal management." The letter detailed examples of the school's fiscal mismanagement, which had resulted in significant wasting of financial resources. Examples of Benji's financial problems while under Robinson's direction included the following:

(1) BSEA was the subject of a warrant hold following its nonpayment to the Teachers Retirement System in the amount of $43,000 for retirement contributions and $13,000 in health coverage;

(2) The Department of Agriculture cancelled BSEA's participation in child nutrition programs because of BSEA's failure to demonstrate fiscal responsibility;

(3) BSEA owed a debt of $87,000 to the IRS in unpaid taxes;

(4) BSEA's board failed to oversee or adequately supervise its financial resources; and

(5) BSEA had been in poor financial condition for many years.

In his letter, the TEA Commissioner also noted the irregularities in Benji's rental arrangement and payments: BSEA leased the property from the City of Houston for $1 per year and re-leased this same property to Benji's for $9,000 per month, an arrangement for which the City had never given its permission.

5

## B. KTRK's Statements at Issue

A public outcry ensued over the charter revocation and the school's closing. Several local media outlets—including KTRK—broadcast and posted numerous reports about the ongoing controversy. KTRK's reports included the following statements upon which Robinson bases her defamation claim:

(1) "According to the State[,] millions in taxpayer dollars cannot be accounted for" and "[t]he State closure is based on a lack of sufficient financial records, meaning the State doesn't know where over three million dollars of taxpayer money given last year has been spent." (4:30 p.m., September 15, 2010 broadcast)[4]

(2) "For the State, the issue is simple—where is the money? They say millions of taxpayer dollars are unaccounted for . . . The State closure is based on a lack of sufficient financial records, meaning the State doesn't know where the more than $3 million of taxpayer money given last year has been spent . . . ." (September 15, 2010 article published on KTRK's website)

(3) "Where is taxpayer money going and how is a taxpayer-owned building being used? . . . The Texas Education Agency says it doesn't know how Benji's spent $3 million of taxpayer money, and a lease agreement obtained by Eyewitness News raises even new questions." (September 25, 2010 article published on KTRK's website)

(4) "The Texas Education Agency doesn't know how the academy spent $3 million of state money." (September 27, 2010 article published on KTRK's website)

(5) "The [S]tate says it had no choice, alleging Benji's did not provide proper financial records to account for over $3 million in state

---

[4] As an exhibit to its Motion to Dismiss, KTRK attached the affidavit of KTRK reporter Cynthia Cisneros. In her affidavit, Cisneros states "I was [] informed by the TEA that Benji's had received $3.3 million in 2009-2010."

funding for the past year." (September 30, 2010 article published on KTRKs website)

(6) "On September 14, the TEA ordered Benji's Academy to close, citing millions of dollars in State funding that was not accounted for." (October 11, 2010 article published on KTRK's website)

## C. Trial Court Proceedings

On September 14, 2011, Robinson and BSEA sued KTRK for defamation.[5] On December 21, 2011, KTRK filed a motion to dismiss under the TCPA. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 27.001-.011 (West Supp. 2012). KTRK argued that it was entitled to dismissal because (1) plaintiffs' claim was based on, related to, or in response to KTRK's exercise of its right of free speech, and (2) plaintiffs could not establish by clear and specific evidence a prima facie case for each essential element of their case. Robinson filed a response.[6] Both parties attached affidavits and other evidence to their pleadings.

The trial court conducted a hearing on February 13, 2012. On February 23, 2012, the trial court entered an amended order denying KTRK's motion to dismiss. On February 29, 2012, KTRK filed its request for findings and conclusions regarding the court's denial of its motion to dismiss. On March 20, 2012, the trial

---

[5] Robinson originally filed this suit against KTRK's parent company, The Walt Disney Company, in federal court. After the suit was dismissed, Robinson attempted to add Disney and KTRK to a federal lawsuit against the TEA in which she had joined. The federal court denied leave to add Disney and KTRK as defendants in the federal action.

[6] BSEA was no longer a plaintiff in the case.

7

court issued its "Findings of Fact In Connection with CPRC §27.007." KTRK timely appealed.

## Discussion

### A. Appellate Jurisdiction

As a threshold matter, we address Robinson's contention that we do not have jurisdiction over this interlocutory appeal. *See Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 228 (Tex. 2004) ("[A] court must not proceed on the merits of a case until legitimate challenges to its jurisdiction have been decided.") Generally, courts of appeals have jurisdiction only over appeals from final judgments. *Lehmann v. Har–Con Corp.,* 39 S.W.3d 191, 195 (Tex. 2001). Further, appellate courts have jurisdiction over interlocutory orders only when that authority is explicitly granted by statute. *Tex. A & M Univ. Sys. v. Koseogtu*, 233 S.W.3d 835, 840 (Tex. 2007). Statutes authorizing interlocutory appeals are strictly construed because they are a narrow exception to the general rule that interlocutory orders are not immediately appealable. *CMH Homes v. Perez,* 340 S.W.3d 444, 447 (Tex. 2011).

Section 27.008 of the TCPA, entitled "Appeal," provides:

(a) If a court does not rule on a motion to dismiss under Section 27.003 in the time prescribed by Section 27.005, the motion is considered to have been denied by operation of law and the moving party may appeal.

8

(b) An appellate court shall expedite an appeal or other writ, whether interlocutory or not, from a trial court's order on a motion to dismiss a legal action under Section 27.003 or from a trial court's failure to rule on that motion in the time prescribed by Section 27.005.

(c) An appeal or other writ under this section must be filed on or before the 60th day after the date the trial court's order is signed or the time prescribed by Section 27.005 expires, as applicable.

TEX. CIV. PRAC. & REM. CODE ANN. § 27.008.

Robinson relies on the Fort Worth Court of Appeals's decision in *Jennings v. Wallbuilders Presentations, Inc.* to argue that although section 27.008(a) authorizes an interlocutory appeal when a movant's motion to dismiss is denied by operation of law, the TCPA does not authorize an interlocutory appeal of a trial court's signed order denying a motion to dismiss. *See Jennings*, 378 S.W.3d 519, 524–27 (Tex. App.—Fort Worth 2012, pet. filed). There, the court held that the language in the TCPA conferred jurisdiction to review a decision under the TCPA, but only if the motion is denied by operation of law, and not if the trial court signs an order denying the motion. *See id.* at 526–27. The *Jennings* court concluded that the legislature intended to ensure that a court would review and rule on the motion, but not that its ruling would be subject to appellate review. *See id.* at 527.

Since *Jennings*, several other courts of appeals have considered the issue. In *Direct Commercial Funding, Inc. v. Beacon Hill Estates, LLC*, the Fourteenth Court of Appeals declined to follow *Jennings*. *See* No. 14–12–00896–CV, 2013

9

WL 407029 (Tex. App.—Houston [14th Dist.] Jan. 24, 2013, order). The *Beacon Hill Estates* court noted that section 27.008(b) requires an appellate court to "expedite an appeal or other writ, whether interlocutory or not, from a trial court order on a motion to dismiss . . . or from a trial court's failure to rule." *Id.* at *3. The court reasoned that "[i]f no interlocutory appeal is available when the trial court expressly rules on a motion to dismiss by signing an order, then the phrase 'from a trial court order on a motion to dismiss' appearing after the phrase 'whether interlocutory or not' is rendered meaningless." *Id.* The court further concluded the most natural reading of the phrase "whether interlocutory or not" is to read it as modifying both of the subsequent references to "a trial court order" and "a trial court's failure to rule." *Id.* Finally, the court noted that section 27.008(c) states an appeal "must be filed on or before the 60th day after the date the trial court's order is signed or the time prescribed by section 27.005 expires, as applicable." *Id.* at *4. The court concluded that "[i]f no signed order can be the subject of an interlocutory appeal, then the reference to the date on which 'the trial court's order is signed' also is superfluous." *Id.* The Fifth and Thirteenth Courts of Appeals have since adopted the Fourteenth Court of Appeals's interpretation of section 27.008. *See Better Bus. Bureau of Metro. Dallas, Inc. v. BH DFW, Inc.*, __ S.W.3d __, No. 05-12-00587-CV, 2013 WL 2077636, at *6 (Tex. App.—Dallas May 15, 2013, no pet. h.) (finding reasoning of Fourteenth Court of Appeals

persuasive and concluding that it had jurisdiction under TCPA over interlocutory appeal of trial court's order denying defendant's motion to dismiss); *San Jacinto Title Svcs., LLC v. Kingsley Props., LP.*, __ S.W.3d __, No. 13-12-00352-CV, 2013 WL 1786632, at \*4 (Tex. App.—Corpus Christi Apr. 25, 2013, no pet. h.) (agreeing with Fourteenth Court of Appeals that to conclude that no signed order can be subject of interlocutory appeal would render portions of section 27.008(b) and (c) meaningless).

We agree with the Fourteenth Court of Appeals's reasoning in *Beacon Hill Estates*. We conclude that section 27.008 permits an interlocutory appeal from the trial court's written order denying a motion to dismiss under the TCPA.

## B. Application of the TCPA

In enacting the TCPA, the Legislature explained that the statute's purpose "is to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury." Tex. Civ. Prac. & Rem. Code Ann. § 27.002. The statute is to "be construed liberally to effectuate its purpose and intent fully." *Id.* § 27.011(b).

In deciding whether to grant a motion under the TCPA and dismiss the lawsuit, the statute directs the trial court to "consider the pleadings and supporting

11

and opposing affidavits stating the facts on which the liability or defense is based." *Id.* § 27.006. The court must then determine whether (1) the moving defendant has shown "by a preponderance of the evidence that the legal action is based on, relates to, or is in response to the party's exercise of the right of free speech, the right to petition, or the right of association"; and (2) the plaintiff has shown "by clear and specific evidence a prima facie case for each essential element of the claim in question." *Id.* § 27.005(b), (c). The first step of this inquiry is a legal question we review de novo. *Newspaper Holdings, Inc. v. Crazy Hotel Assisted Living, Ltd.*, No. 01-12-00581-CV, 2013 WL 1867104, at *6 (Tex. App.—Houston [1st Dist.] May 2, 2013, no pet. h.).

The Legislature's use of the term "prima facie case" in the second step implies a minimal factual burden: "[a] prima facie case represents the minimum quantity of evidence necessary to support a rational inference that the allegation of fact is true." *Id.* at *6 (quoting *Rodriguez v. Printone Color Corp.*, 982 S.W.2d 69, 72 (Tex. App.—Houston [1st Dist.] 1998, pet. denied)). Nonetheless, the statute requires that the proof offered address and support each "essential element" of every claim asserted with "clear and specific evidence." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(b), (c). Because the statute does not define "clear and specific" evidence, these terms are given their ordinary meaning. *See TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011). "Clear"

12

means "unambiguous," "sure," or "free from doubt." BLACK'S LAW DICTIONARY 268 (8th ed. 2004). "Specific" means "explicit" or "relating to a particular named thing." *Id.* at 1167. Accordingly, we examine the pleadings and the evidence to determine whether Robinson marshaled "clear and specific" evidence to support each alleged element of her cause of action.

As a preliminary matter, we note that Robinson has never asserted, either in the trial court below or on appeal, that her claim is not covered by the TCPA. That is, she does not argue that her defamation claim is not based on, related to, or in response to KTRK's exercise of its right to "petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law." As such, we begin with the second step of the inquiry—whether Robinson has demonstrated by clear and specific evidence a prima facie case for each essential element of her claim.

## C. Prima Facie Case

To maintain a defamation cause of action, a plaintiff must prove that the defendant (1) published a statement; (2) that was defamatory concerning the plaintiff; (3) while acting with either actual malice, if the plaintiff was a public official or public figure, or with negligence, if the plaintiff was a private individual, regarding the truth of the statement. *WFAA–TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998). "Whether words are capable of the defamatory

13

meaning the plaintiff attributes to them is a question of law for the court." *Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex. 1989). Questions of law are subject to de novo review. *In re Humphreys*, 880 S.W.2d 402, 404 (Tex. 1994). Whether a publication is an actionable statement of fact depends on its verifiability and the context in which it was made. *See Bentley v. Bunton*, 94 S.W.3d 561, 581 (Tex. 2002).

### Defamatory Statement

Robinson argues that she has demonstrated that KTRK "made up" the complained-of statements and, in doing so, has established a prima facie case of defamation *per se*. KTRK contends that Robinson failed to establish with clear and specific evidence that the complained-of statements were defamatory *per se*.

We initially address KTRK's contention that Robinson has alleged only a claim of defamation *per se*. Defamation claims are divided into two categories— defamation *per se* and defamation *per quod*—according to the level of proof required to make them actionable. *See Texas Disposal Sys. Landfill, Inc. v. Waste Mgmt. Holdings, Inc.*, 219 S.W.3d 563, 580 (Tex. App.—Austin 2007, pet. denied). Statements that are defamatory *per quod* are actionable only upon allegation and proof of damages. *Id.* at 580; *Alaniz v. Hoyt*, 105 S.W.3d 330, 345 (Tex. App.—Corpus Christi 2003, no pet.). That is, before a plaintiff can recover for defamation *per quod*, she must carry her burden of proof as to both the

14

defamatory nature of the statement and the amount of damages caused by its publication. *See Texas Disposal*, 219 S.W.3d at 580 (citing *Leyendecker & Assocs., Inc. v. Wechter*, 683 S.W.2d 369, 374 (Tex. 1984)). By contrast, in cases involving defamation *per se*, damages are presumed to flow from the nature of the defamation itself and, in most situations, a plaintiff injured by a defamatory *per se* communication is entitled to recover general damages without specific proof of the existence of harm. *Bentley*, 94 S.W.3d at 604 ("Our law presumes that statements that are defamatory *per se* injure the victim's reputation and entitle him to recover general damages, including damages for loss of reputation and mental anguish.").

KTRK argues that Robinson neither pleaded nor presented any proof of the amount of alleged damages, and thus, her claim is one for defamation *per se* only. In her petition, Robinson alleged that KTRK's statements damaged her reputation. In her prayer, Robinson sought judgment "[f]or libel *per se* damages found by the trier of fact without proof of special damages [and] for actual damages and exemplary damages for malicious libel . . . ." In her appellate brief, Robinson does not dispute KTRK's contention that her claim sounds only in defamation *per se*. Indeed, she asserts that she has "established by clear and specific evidence a prima facie case on each element of her claim that the complained of statements were defamatory *per se*." Based upon the record before us, we agree that Robinson has

not alleged a claim for defamation *per quod* and, therefore, our analysis treats upon Robinson's claim as one for defamation *per se.*

The law presumes certain categories of statements are defamatory *per se*, including statements that (1) unambiguously charge a crime, dishonesty, fraud, rascality, or general depravity or (2) are falsehoods that injure one in his office, business, profession, or occupation. *Main v. Royall*, 348 S.W.3d 381, 390 (Tex. App.—Dallas 2011, no pet.). Robinson complains of the following statements made by KTRK:

(1) "According to the State[,] millions in taxpayer dollars cannot be accounted for" and "[t]he State closure is based on a lack of sufficient financial records, meaning the State doesn't know where over three million dollars of taxpayer money given last year has been spent." (4:30 p.m., September 15, 2010 broadcast)

(2) "For the State, the issue is simple—where is the money? They say millions of taxpayer dollars are unaccounted for . . . The State closure is based on a lack of sufficient financial records, meaning the State doesn't know where the more than $3 million of taxpayer money given last year has been spent . . . ." (September 15, 2010 article published on KTRK's website)

(3) "Where is taxpayer money going and how is a taxpayer-owned building being used? . . . The Texas Education Agency says it doesn't know how Benji's spent $3 million of taxpayer money, and a lease agreement obtained by Eyewitness News raises even new questions." (September 25, 2010 article published on KTRK's website)

(4) "The Texas Education Agency doesn't know how the academy spent $3 million of state money." (September 27, 2010 article published on KTRK's website)

16

(5) "The [S]tate says it had no choice, alleging Benji's did not provide proper financial records to account for over $3 million in state funding for the past year." (September 30, 2010 article published on KTRKs website)

(6) "On September 14, the TEA ordered Benji's Academy to close, citing millions of dollars in state funding that was not accounted for." (October 11, 2010 article published on KTRK's website)

Robinson argues these statements to be defamatory *per se* because they insinuate that she embezzled over $3 million and thereby falsely imputed criminal behavior to her. Robinson also contends that KTRK's statements have damaged her reputation and, in support of her argument, points to the following third-party comments posted by readers on KTRK's website in response to the broadcasts and articles:

- "Call and ask where the money went. I'm sure Theola [sic] Robinson tell you."

- "Could it be in somebody's pockets?"

- "Ms. Robinson should be arrested, not because she's black, because she's a thief!"

- "I am just amazed as to why the parents are not suing Theaola Robinson and the old Board of Director[s], they are the ones who are stealing their children's future . . . ."

- "You bet they want to keep it open, if its [sic] closed an investigation will show they were all taking money not to mention they won't be able to afford their new house, Hummer and boat payments the school and taxpayers were helping to buy."

17

- "The state is not to blame here. They need to sue the administrators to find out where the money is followed by prosecution of those who may have 'mis-spent' it. Put blame where blame is due!"

- "Simple! No money! Can not account for $9 million! Close the doors and take the administrators to court for mis-use of government (your) money . . . ."

- "The only thing organized about this plan is the organized crime."

- "The parents are supporting the administrators who have a little charisma along with a talent for lining their pockets . . . ."

- "The mgmt. of this facility will continue to steal under the guide [sic] of a school, where the kids will continue to suffer."

Robinson's reliance on third-party comments posted on KTRK's comment board to prove defamation *per se* is misplaced. To be defamatory *per se*, the defamatory nature of the challenged statement must be apparent on its face without reference to extrinsic facts or "innuendo." *Moore v. Walthrop*, 166 S.W.3d 380, 386 (Tex. App.—Waco 2005, no pet.) (noting that "the very definition of '*per se*,' 'in and of itself,' precludes the use of innuendo"). If the court must resort to innuendo or extrinsic evidence to determine whether a statement is defamatory, then it is defamation *per quod* and requires proof of injury and damages. *Main*, 348 S.W.3d at 390. There is nothing intrinsically defamatory about KTRK's reports on the State's investigation into Benji's mismanaged funds. The reports did not say or imply that the entire $3 million in state funds had been

18

misappropriated or embezzled. Rather, the statements speak to the insufficiency of financial records to account for spent state funds. Similarly, the September 25th broadcast questioning the lease situation neither states nor implies that state funds were misappropriated.

Further, the evidence shows that the TEA's longstanding concern about and subsequent investigation into Benji's accounting resulted in the suspension and, ultimately, the revocation of the school's charter due to the urgent financial conditions and its fiscal mismanagement. Thus, KTRK's reports that the State found Benji's financial records insufficient to fully account for the money spent, and that the State did not know how the money had been spent, were based on evidence that Robinson did not counter. Media defendants cannot be liable for varying subjective impressions that may have been generated from the broadcast of true statements. *See ABC, Inc. v. Gill*, 6 S.W.3d 19, 35–38 (Tex. App.—San Antonio 1999, pet. denied).

Robinson also argues that because KTRK's broadcasts on questions of financial mismanagement reported the amount of total funding, the statements falsely suggest that she failed to account for any of it, when, in fact, she did provide records to show how part of the funds were spent. KTRK's reports, however, never recited that she had failed to account for any of it, but that the TEA had found the records provided were insufficient to account for the full amount.

19

Moreover, discrepancies as to details do not demonstrate material falsity for defamation purposes. *See, e.g.*, *Dolcefino v. Turner*, 987 S.W.3d 100, 115 (Tex. App.—Houston [14th Dist.] 1998), *aff'd*, 38 S.W.3d 103 (Tex. 2000) (showing that insurance fraud "scam" involved $1.7 million, rather than $6.5 million, did not demonstrate falsity of statement); *Rogers v. Dallas Morning News, Inc.*, 889 S.W.2d 467, 471–73 (Tex. App.—Dallas 1994, writ denied) (misstatement that charity spent 10% of its donations on actual services, rather than 43%, was immaterial to gist of articles concerning misuse of charity funds); *Finklea v. Jacksonville Daily Progress*, 742 S.W.2d 512, 514–15 (Tex. App.—Tyler 1987, writ dism'd w.o.j.) (misstatement that plaintiff had four drug convictions, rather than two, was substantially true); *Shihab v. Express-News Corp.*, 604 S.W.2d 204, 206–08 (Tex. Civ. App.—San Antonio 1980, writ ref'd n.r.e.) (inaccurate designation of which of several news stories was fabricated was insignificant where the main charge was fabrication and one story was fabricated); *Downer v. Amalgamated Meatcutters & Butcher Workmen of N. Am.*, 550 S.W.2d 744, 747 (Tex. Civ. App.—Dallas 1977, writ ref'd n.r.e.) (misstatement that plaintiff embezzled $2,187.77, rather than $840.73, was substantially true); *Fort Worth Press Co. v. Davis,* 96 S.W.2d 416, 419–20 (Tex. Civ. App.—Fort Worth 1936, writ ref'd) (article charging official with wasting $80,000 of tax money rather than only $17,500 was substantially true).

In sum, there is nothing in the complained-of statements that unambiguously charged Robinson with engaging in criminal behavior or constituted a falsehood that injured her in her profession. Because Robinson has not adduced clear and specific evidence that the challenged statements made by KTRK in its broadcasts and reports are defamatory *per se*, she has not made a prima facie case for each essential element of her defamation claim against KTRK. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005 (b), (c) (West Supp. 2012).

## Conclusion

Having concluded that we have jurisdiction over this interlocutory appeal and that Robinson failed to sustain her burden to show a prima facie case for each essential element of her defamation claim, we reverse the trial court's denial of KTRK's motion to dismiss, and remand the case to the trial court for further proceedings as required by the statute to order dismissal of the suit. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.009(a).


                                          Jim Sharp
                                          Justice


Panel consists of Justices Bland, Sharp, and Massengale.