**Opinion issued August 11, 2016**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-15-00231-CV

————————————

## ROGER EPPERSON, Appellant

## V.

## TODD MUELLER D/B/A AUTOGRAPHNEWSLIVE.COM, Appellee

On Appeal from the 133rd District Court
Harris County, Texas
Trial Court Case No. 2013-51411

## MEMORANDUM OPINION

In this interlocutory appeal,[1] appellant, Roger Epperson, challenges the trial

court's denial of his motion to dismiss, pursuant to the Texas Citizens' Participation

---

[1]    *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.008(a) (Vernon 2015) ("If a court
       does not rule on a motion to dismiss . . . within the time prescribed . . . , the motion

Act ("TCPA"),[2] the counterclaims of appellee, Todd Mueller, doing business as Autographnewslive.com, for business disparagement and tortious interference with prospective relations. In his sole issue,[3] Epperson contends that the trial court erred in denying his motion to dismiss Mueller's counterclaims.

We affirm.

## Background

In his counterclaims,[4] Mueller alleges that he and Epperson are competitors "engaged in the business of buying and selling collectible memorabilia consisting primarily of autographed images of celebrities and celebrity memorabilia." "For more than two decades," he and Epperson have "sold such memorabilia to the public through a variety of outlets, including eBay and other [i]nternet-based venues as well as at trade shows." And, "[o]ver the past few years," Epperson has "used"

---

[2] *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 27.001–.011 (Vernon 2015).

[3] Although Epperson, in his appellate briefs, presents five issues, each, in substance, is a subpart of his overarching issue that the trial court erred in denying his motion to dismiss Mueller's counterclaims against him.

[4] In his petition, Epperson brought a defamation claim against Mueller, alleging that he "is in the business of collecting, identifying and authenticating signatures and autographs, particularly in the music industry," his business "depends upon his integrity and the trust that he has established," and Mueller is "in the related business of buying and selling memorabilia." Epperson cited fourteen instances in which he alleged that Mueller had published defamatory statements about him in order to "gain a competitive advantage."

2

"Autograph Magazine Live!" ("AML"), an online forum for autograph collectors, as a "platform to ruin the business and economic interest that Mueller has in selling autographed memorabilia," including, "affirmatively calling into question the validity of" his autographs and memorabilia," which "strip[s] the value out of the products [he] sells."

Mueller specifically complains about a "thread" published on AML on May 7 and 8, 2013, in which Epperson opined that Mueller was selling "forge[d]" autographs:

> **Posted by Don Hakka . . . in Is This Autograph Real?**
>
> After his behavior here at AML I'm not interested in buying anything from him, but would just for the fun of it like to know what you think of these 4 autographs?
>
> They can't all be bad, or can they???
>
> [Michael Jackson] 1:
> http://auction.toddmuellerautographs.com/Bidding . . .
> [Michael Jackson] 2:
> http://auction.toddmuellerautographs.com/Bidding . . .
> Rolling Stones:
> http://auction.toddmuellerautographs.com/Bidding . . .
> Arnold/Terminator:
> http://auction.toddmuellerautographs.com . . .
>
> Thanks for helping!
>
> **Reply by [Epperson] . . .**
>
> Come on guys, who wants to get a horrible story written about them?
> Come on guys . . . step right and state the truth!
>
> **Reply by Mykaphobic . . .**
>
> I also believe Todd to be consigning items to other auction houses.

I guess nothing [is] too much wrong with that except I will make 2 points on this[:]

1) [H]e is doing it to a cheap site. Items are selling for $10-$20. Why would he consign his "real" items that would be only sold that cheaply.

2) [H]e is writing his [certificates of authenticity] to a person at the other company, meaning his [certificates] are void if you win the item. (He only covers [the] original buyer[.])

Just something to think of.

### Reply by [Epperson] . . .

I never even gave my opinion which of course is that *the music autographs mentioned (I don't know Arnold's autograph) are very poor forgeries in my opinion along with many more that he is auctioning right now.* But he attacked me just for saying what I did earlier. This guy is a creep and so are all his creepy friends. The Stones LP is a total joke as is his Springsteen's, Madonna's, Aretha's, Bab's, Bee Gees, Elvis and so many more.

### Reply by JJ . . .

Thanks for being candid, Roger. Your honesty is not only appreciated—it's valuable? [sic] I'd like to think that there are plenty of people here who have your back. So don't back down!

### Reply by Don Hakka . . .

Thanks Roger, Mykaphobic and Jamil! It's just embarrassing (and sad) to see the amount of pure crap he sells every week . . . .

In the item description for the Stones album he even wrote: "It's been years since we had a fully signed Stones item we knew was authentic. Here is one!" Shame on you Todd, you're a really bad bad boy . . . .

### Reply by Mykaphobic . . .

What is sad about the whole thing is a month or so ago I saw a signed Michael Jordan basketball. To me it looked great. But just having the [Mueller] [certificate of authenticity] turned me against buying it. If it had no [certificate] at all I would of jumped on it.

4

. . . .

**Reply by Dan Gregory . . .**

All 4 are terrible fakes.  The Arnie miles off and as for the Stones, it's a joke.  The MJ's also look miles off.  I know he has an eBay account that sells stuff that does not sell on his own site.

As for the emails to you and your family Steve, that is beyond disgusting.  I guess he tries anything to stop the truth coming out.

**Reply by [Epperson] . . .**

Dan,
You are correct, he will stop at nothing to cover up the truth. You have absolutely no idea what goes on behind the scenes in his world. Steve and I have emails that would make your skin crawl that came from him and to us and others.  The email that Steve talks about I have read in full and I swear to you it made me sick.

. . . .

**Reply by Don Hakka . . .**

@ Steve and Roger:

I'm sorry to hear about the disgusting things that you and your family have to endure, but I admire that you guys still have the strength to keep up the good work!!!

**Reply by Steve Cyrkin, Community Manager . . .**

Thanks, Don.  Of course, now Mueller is going to post more BS on his anonymous website. All these guys are ridiculous cowards. [Mueller] . . . and [his] friends won't even use their real names.

**Reply by [Epperson] . . .**

Todd is as predictable as a bowel movement after coffee and a bran muffin.

. . . .

(Italicized emphasis added.)

5

Mueller also alleges that Epperson, on August 3, 2013, published the following message on AML, stating that Mueller sells only "fake" autographs:

> I am sorry to hear about your dealings with [Mueller] of Colorado Springs Co[lorado,] as I am quite sure if you have bought any music autographs from him then you have bought fake autographs.

On August 25, 2013, Epperson published the following message on AML:

> I'm sorry but in my opinion [Mueller] has NEVER been reliable in selling of authentic autographs. Just look at the many catalogs he put out and were shown here on this site and you can tell for yourself. He has gotten much worse in the selling of fake autographs in my opinion . . . . This was his intimidation "tool" to try to fool buyers while hiding his sites under "proxy" businesses. This will soon be proven in the court of law and [Mueller] and all of his creepy friends will have to pay for it.

And on December 13, 2013, Epperson published the following message on AML:

> **Reply by [Epperson] . . .**
>
> If I sold garbage like these I would be embarrassed and try to get them off too. If they were authentic why would you remove them?
>
> **Reply by Xpertexpert . . .**
>
> [T]his is so true roger. [T]odd is a snake and we all know it.

Mueller further alleges that on October 21 and 30, 2013, Epperson contacted eBay and "falsely reported" that he had listed an item for sale that "infringed [on] a trademark" and was "selling forged autographs." And on November 18 and 25, 2013, Epperson contacted Amazon.com and "falsely reported" that he was "engaged in the selling of forged autographs and/or fake sports memorabilia."

Mueller complains that Epperson has "published multiple disparaging statements of fact regarding Mueller's economic interests, namely, the character and quality of the autographed memorabilia that Mueller sells and the general character of how [he] does business." He asserts that Epperson's statements are "false," Epperson acted with malice, and Epperson caused him to lose 1,320 "loyal customers," who had previously purchased $1,706,347.99 in items from him. Mueller seeks $2,559,522.00 in actual damages.

Epperson moved to dismiss Mueller's claims pursuant to the TCPA,[5] asserting that the claims "are based upon, relate to, or are in response to" Epperson's "exercise of the rights of free speech and association." Epperson further asserted that he is an "established autograph authenticator and autograph hobby community media figure" and his statements were "made out of concern as to the authenticity of [Mueller's] autographed memorabilia offered to the public"; to "individuals with common interest"; and "regard[ed] a matter of public concern." In his affidavit, Epperson testified in pertinent part as follows:

> 2. I have been in the business of autograph authentication for over twenty-three years with a specialty of authentication of musician's autographs. . . . I am generally considered one of the leading autograph authenticators in the field of music. . . .
>
> 3. I am the owner and authenticator for Signed Sealed Delivered, a twenty-three year old business that has become an online store of autograph memorabilia . . . .

---

[5] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.003.

4.	I provide autograph authentication services through James Spence Authentication, . . . and have done so in the past for other services . . . that are long established [as] the only authentication services recommended by eBay for sales of . . . autographed memorabilia . . . .

5.	I am consulted and used as an autograph authenticator by the following auction houses that buy and sell autographed items:

a.	RR Auction. RR Auction is the largest auction house of autographed items in the world. I have been their music autograph authenticator for over 6 years. I am consulted as an expert in the field of music autographs. RR Auction puts out a monthly catalog in which I examine approximately 100 or more autographs a month.

. . . .

6.	In a typical month, I professionally authenticate approximately 250 to 300 signatures at the request of the autograph hobby community. . . .

7.	I am also regularly involved in media appearances and consultations involving discussion of the subject of music autograph authentication, including the following media television, internet magazine, blog, forum and radio shows:

a.	Inside Edition, the CBS American television syndicated news magazine program. . . .

b.	PBS Television's History Detectives. . . .

. . . .

d.	VH1 Television's For What it's Worth. I have appeared on six episodes. . . .

e.	Cajun Pawn Stars. . . .

f.	Autograph Magazine. . . .

. . . .

h.	107.5 FM Classic Hits. I have a quarterly radio show where listeners call in for information for an evaluation on their autographed items.

i.	[AML]. On this website I have an online blog and participate in discussion forums where I share my

knowledge with others interested in the field of music autographs.

. . . .

8. I have been consulted as an expert in autograph authentication by representatives of the FBI on several occasions and as an expert witness in at least 4 court cases involving identification of forged documents.

. . . .

11. The comments or publications that I have made regarding [Mueller] have all been from the point of view of an established authenticator of autographed memorabilia, an active participant in the autograph hobby community and as a commentator on autograph hobby community issues. My comments are not directed at the business interests of [Mueller] but instead at the quality of autographed music memorabilia that is or has been offered by [Mueller]. My comments are not directed at all the memorabilia that [Mueller] has or offers. My comments are only directed at music autographs [he] has made public, as that is the area of my observation, expertise and experience. . . . [Mueller] has sought my advice regarding authenticity in the past. Although I do buy and sell autographed memorabilia, as does [Mueller], our businesses do not compete in any meaningful way. [Mueller] sells a broad array of memorabilia and I sell music memorabilia. I have never been critical of [him] in order to convince someone to purchase from or sell to me instead of [him]. If I have interfered with [Mueller's] business or any actual or potential customer of [his], it has been incidental to my purpose of authenticating autographs and discussing the authentication of autographs with the community of people who have interests in the collection of autographed memorabilia.

. . . .

18. I am familiar with [Mueller] as a buyer and seller of autographed memorabilia. He operates what I understand to be a privately owned business that buys and sells memorabilia and conducts online auctions of memorabilia. He operates an online website that solicits buyers and sellers . . . .

9

19. I am familiar with [Mueller] as a public figure in the autograph hobby community. My knowledge is the result of having observed, written and commented about the public controversy that surrounds [Mueller's] autograph sales offerings and activities and his participation in publishing an internet magazine . . . . My observation and comment has been done in the course of my interest in and concern about the autograph hobby community and my work as an autograph authenticator and a media participant.

20. . . . . [Mueller's] own website auctions and sales are one of the largest private autographed memorabilia sales sites that display to the public. In recent years I have seen a growing number of autographed music memorabilia brought to my attention that I have considered questionable, doubtful or incorrect as to authenticity that came from [Mueller] or his business. Second, there are numerous writings and internet forum and news sites directed to the autograph hobby community that have made [Mueller] the subject of public attention regarding authentication of autographed memorabilia. One of these sites is the subject of [his] allegations. . . .

21. . . . . I have examined items of memorabilia that [Mueller] or his business has offered and I have found questionable as to authenticity, . . . and I am concerned about the consumer who purchases autographed items based upon the perceived assurance that the items are genuine because the consumer is given an assurance or certificate of authenticity as to the autograph by a seller. [Mueller] is one such seller who concerns me. . . . I have studied autographed memorabilia he offers for sale or has sold and written about it and commented about it in media appearances. The obvious problem that a consumer who buys an autograph faces is that the signatory is usually dead or not accessible to confirm the authenticity of the signature. Even the best and most honest of authenticators, which I consider myself one of, cannot with certainty tell whether a signature is the one it is represented to be. This fact is what allows some sellers or authenticators to represent that [an] autograph is genuine when most others would have a very different opinion. The public controversy that I address in this Affidavit concerns first, a general controversy of the autograph market being filled with

fake or even just questionable autographs and second, that the fake or questionable autographs are made to appear genuine because they usually come with an assurance or certificate of an authenticator assuring the buyer in writing that the autograph is real and valuable. The controversy is an ever present concern of the collection community and especially as it relates to these buyers who are eager and new to collecting.

22. . . . . Except as discussed below, my contact and comment regarding [Mueller] has been based upon the actual offer of autographed memorabilia of [Mueller] that I have studied in the course of my interest and work, the autograph community news and information that I read or exchange with others and my desire to educate the consuming public about autograph issues. . . .

. . . .

24. The statements identified as my own in [Mueller's petition] are statements that I made in online forums conducted by an internet magazine named [AML]. . . . I do regularly appear on [AML] to discuss issues of interest or concern to the autograph hobby community. I am regularly asked in forums about my opinion of authenticated memorabilia by collectors interested in memorabilia.

25. The statements identified as my own in [Mueller's petition] are statements that I made in the course of internet forum discussions among various people interested in and concerned about the autograph hobby generally and the autograph authentication practice of [Mueller] in particular. The first four of these statements are quoted by [Mueller] in the context of an internet forum discussion, entitled "Michael Jackson x2, Stones and Terminator from Todd Mueller—Real or Fakes?". . . . [M]y statements were in reply to another individual's posted question . . . concern[ing] the authenticity of memorabilia items that [Mueller] had posted to the public, and concern over [his] reputation in the autograph hobby community. . . .

. . . .

27. The second group of alleged statements . . . in [Mueller's petition] simply allege that based upon [his] "information and belief" [I] ha[d] made various unidentified statements or reports

11

to representatives of either eBay or Amazon.com that [Mueller] was engaged in selling forged autographs and or fake sports memorabilia or an item that infringed a trademark. Although it is not clear what [Mueller] alleges [I] may have stated, I do not recall ever making such statements to any representatives of eBay or Amazon.com. I have been asked to consult with eBay representatives in the past regarding authenticity of autographed memorabilia. If I made such reports or statements, they would have been to individuals interested in association for the purpose of discussing matters of common interest or common concern, namely the sale of authentic memorabilia and memorabilia that did not infringe a trademark. . . .

28. The statements identified as my own in [Mueller's petition] are not statements that I made arising out of the sale or lease of goods or services, nor was my intended audience an actual or potential buyer or customer. The statements alleged were made, if at all, without compensation or sale of goods or services. The statements were made only regarding a shared interest or common concern with the autograph hobby community regarding authenticity of autographed memorabilia.

In his response, Mueller, as discussed in detail below, argued that Epperson's statements "are not protected by the TCPA" because Epperson, while "providing his authentication services," "engaged in commercial speech" when he "attacked Mueller's business interests." Mueller further asserted that he, in his affidavit, presents "clear and specific evidence" establishing a prima facia case for each of his claims against Epperson. In his affidavit, Mueller testified:

3. I started in the autograph business in 1978 as a collector of autographs. . . .

4. Currently, I arguably purchase more autographed material than anyone else in the world. . . . I have consistently sold only authenticated autographs backed up by my authenticity guarantee, so there is no reason that I would knowingly sell non-

12

authentic autographs if I would have to refund the money if it my memorabilia was proved to be nonauthentic.

5. Through my experience, I have collected one of the largest exemplar files in the world for autographed memorabilia. This means that I have examples of authentic autographs of nearly every single person of fame from nearly every single autograph dealer's catalogs from the 1960's to the present day. . . .

. . . .

11. In the May 7 and 8, 2013, posts, Epperson was responding to questions about the authenticity of some of the authentic items I had for sale, including the "MJ 1", "MJ 2", "Rolling Stones," and "Arnold/Terminator." These posts had a direct and specific result on my sales, while similar pieces that Epperson had authenticated were selling for much more. Epperson had a direct incentive to attack my items as non-authentic so that the items sold with authentication would be sold for much more value.

12. I know that all four of these items were actually authentic, despite Epperson's malicious attack, as I personally purchased these items for resale from a man named Nelson Deedle. Mr. Deedle is a well-respected and well-known autograph dealer that has a stellar track record for only selling authentic items. In fact, R&R Auctions referred me to begin purchasing from Mr. Deedle because of his reputation. In addition to knowing the source of these items, I also had the opportunity of being able to review these items on my own to ensure their authenticity as compared to other items in my catalog. Despite these items being completely authentic, I still lost value and sales of these items because of Epperson's statements.

13. "MJ 1" was photo signed by Michael Jackson that I sold at auction to a man by the name of Tom Stanford for the amount of $381.00. During that same time period, R&R Auction, a competitor of mine, sold a similar photo that Epperson authenticated for $853.00. Thus, I lost out on $472.00 of potential revenue because of Epperson's comments devaluing my item. More egregious is the fact that Tom Stanford read Epperson's comments and requested a refund, which I had to give, losing out on the entire sale!

13

14. "MJ 2" was an album signed by Michael Jackson that sold for the minimum bid of $350 at auction, which was not normal, as my average sale was double the minimum bid. During the same time period, R&R Auction sold a similar piece that Epperson authenticated for $2,185.00. Thus, I lost out on $1,835 of the value of the piece, and at least the double that I was averaging.

15. The "Rolling Stones" is the most egregious. I sold this album at auction for $681.00 to a man named Steve Stein. However, this is one of the last pieces that Mr. Stein ever purchased from me, as he discontinued bidding on July 7, 2013. Again, as with the MJ 1 and MJ 2, R&R Auction sold a similar Rolling Stones album to mine authenticated by Roger Epperson for $3,202.00. Thus, I not only lost a good customer, but I also lost out on $2,521 worth of value because of Epperson's comments devaluing the worth of my items.

16. In addition to the above specific items, Epperson's postings had a lasting effect on the pool of bidders on my auctions, thereby reducing my sales and revenue. Between December 13, 2012 and August 25, 2013, I lost at least 314 registered bidders from my website. Before Epperson began attacking my authentications, my items consistently garnered an average sale of double the minimum bid on the item. However, after Epperson began attacking my authentications, without reserve, we lost the bidders and my items would not bring in the averages that I had come to expect over the many years I had operated my business. Between December 13, 2012, and August 25, 2013, the average sales slipped to only 25% of the minimum bids for a week.

17. Epperson's statements and attacks had a lasting effect. I have lost around 1,320 registered bidders and customers who had purchased thousands of unique items from my catalog since Epperson began attacking my items, Steve Stein and Tom Standford being a part of this loss. The loss of these customers, and the loss of revenue from the reduced value of my items, has cost me over $2,000,000 in lost revenues.

In his reply, Epperson argued that the commercial-speech exemption to the TCPA does not apply because Mueller did not establish that the complained-of

statements arose "out of the sale or lease of goods, services, or a commercial transaction" or were directed at Mueller's actual or potential customers.[6]

After a hearing, Epperson's motion to dismiss Mueller's counterclaims was denied by operation of law.[7]

## Applicability of the TCPA

In his sole issue, Epperson argues that the trial court erred in denying his motion to dismiss, pursuant to the TCPA, Mueller's counterclaims against him because he established that the claims relate to the exercise of his First Amendment rights of freedom of speech and freedom of association. And he asserts that Mueller did not establish that the complained-of speech falls within the TCPA's exemption for commercial speech.[8]

The purpose of the TCPA is "to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law." TEX. CIV. PRAC. & REM. CODE ANN. § 27.002 (Vernon 2015). It "protects citizens . . . from retaliatory lawsuits that seek to intimidate or silence them" from exercising their First

---

[6] *See id*. § 27.003(b).

[7] *See id.* § 27.008(a) ("If a court does not rule on a motion to dismiss . . . within the time prescribed . . . , the motion is considered to have been denied by operation of law and the moving party may appeal.").

[8] *See* § 27.010(b).

Amendment freedoms and provides a procedure for the "expedited dismissal of such suits." *In re Lipsky*, 460 S.W.3d 579, 584, 586 (Tex. 2015); *see* TEX. CIV. PRAC. & REM. CODE ANN. §§ 27.001–.011 (Vernon 2015). The TCPA is intended to identify and summarily dispose of lawsuits "designed to chill First Amendment rights, not to dismiss meritorious lawsuits." *In re Lipsky*, 460 S.W.3d at 589. And it is to be "construed liberally to effectuate its purpose and intent fully." TEX. CIV. PRAC. & REM. CODE ANN. § 27.011(b).

A defendant who believes that a lawsuit is based on his valid exercise of First Amendment rights may move for expedited dismissal of the suit. *In re Lipsky*, 460 S.W.3d at 586. The defendant must first show "by a preponderance of the evidence" the applicability of the TCPA, i.e., that the plaintiff's claim is "based on, relates to or is in response to the [defendant's] exercise of: (1) the right of free speech; (2) the right to petition; or (3) the right of association." *Id.* at 586–87 (internal citations omitted); *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(b). The first step of the inquiry is a legal question that we review de novo. *Whisenhunt v. Lippincott*, 416 S.W.3d 689, 695 (Tex. 2013); *Newspaper Holdings, Inc. v. Crazy Hotel Assisted Living, Ltd.*, 416 S.W.3d 71, 80 (Tex. App.—Houston [1st Dist.] 2013, pet. denied).

If the initial showing is made, the burden then shifts to the plaintiff to establish by "clear and specific evidence" a prima facie case for each essential element of his claim. TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(c); *Lipsky*, 460 S.W.3d at 587–

16

88; *Newspaper Holdings*, 416 S.W.3d at 80. "The legislature's use of 'prima facie case' in the second step of the inquiry implies a minimal factual burden: '[a] prima facie case represents the minimum quantity of evidence necessary to support a rational inference that the allegation of fact is true.'" *Schimmel v. McGregor*, 438 S.W.3d 847, 855 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) (quoting *KTRK Television, Inc. v. Robinson*, 409 S.W.3d 682, 688 (Tex. App.—Houston [1st Dist.] 2013, pet. denied)). In determining whether a legal action should be dismissed, "the court shall consider the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based." TEX. CIV. PRAC. & REM. CODE ANN. § 27.006(a). We review the pleadings and evidence in a light favorable to the plaintiff. *Newspaper Holdings*, 416 S.W.3d at 80–81. If the defendant's constitutional rights are implicated and the plaintiff has not met the required showing of a prima facie case, the trial court must dismiss the plaintiff's claim. TEX. CIV. PRAC. & REM. CODE ANN. § 27.005.

To the degree they are implicated, we review questions of statutory construction de novo. *Molinet v. Kimbrell*, 356 S.W.3d 407, 411 (Tex. 2011). When construing a statute, our primary objective is to ascertain and give effect to the Legislature's intent. *Id.* "We look first to the statute's language to determine that intent, as we consider it 'a fair assumption that the Legislature tries to say what it means, and therefore the words it chooses should be the surest guide to legislative

17

intent.'" *Leland v. Brandal*, 257 S.W.3d 204, 206 (Tex. 2008) (quoting *Fitzgerald v. Advanced Spine Fixation Sys., Inc*., 996 S.W.2d 864, 866 (Tex. 1999)). We consider the statute as a whole rather than focusing upon individual provisions. *TGS–NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011). If a statute is unambiguous, we adopt the interpretation supported by its plain language unless such an interpretation would lead to absurd results. *Id*.

Here, we first consider whether Epperson established that the TCPA applies to Mueller's counterclaims—whether they are "based upon, relate to, or are in response to" Epperson's exercise of the right of free speech, the right to petition, or the right of association. *See Lipsky*, 460 S.W.3d at 586–87. Epperson, in his motion to dismiss, asserted that Mueller's lawsuit is based on Epperson's exercise of the rights of free speech and association. We need only focus on the right of free speech. The TCPA defines the "[e]xercise of the right of free speech" as "a communication made in connection with a matter of public concern." TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(3). A "communication" includes "the making or submitting of a statement or document in any form or medium, including oral, visual, written, audiovisual, or electronic." *Id*. § 27.001(1). A "matter of public concern" includes an issue related to "(A) health or safety; (B) environmental, economic, or community

well-being; (C) the government; (D) a public official or public figure; or (E) a good, product, or service in the marketplace."[9] *Id*. § 27.001(7).

The record shows that Mueller's claims are based on electronic statements that Epperson submitted as a participant in an online forum and statements that Epperson allegedly made to representatives of eBay and Amazon.com. These statements constitute "communications," as defined in the statute. *See id*. § 27.001(1); *Deaver v. Desai*, 483 S.W.3d 668, 673 (Tex. App.—Houston [14th Dist.] 2015 no pet.) (statements on website qualified as communication for purposes of TCPA). Further, the complained-of statements regard a "matter of public concern," as defined, because they relate to the quality of Mueller's goods, which he offers in the marketplace, as "forgeries" and "fake." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(7); *Avila v. Larrea*, 394 S.W.3d 646, 655 (Tex. App.—Dallas 2012, pet. denied) (communication about lawyer's poor services to clients related to service in marketplace); *see also AOL, Inc. v. Malouf*, No. 05-13-01637-CV, 2015

---

[9] "By providing a laundry list of subjects that qualify as an exercise of one's right to free speech, however, the legislature did not abrogate or lessen existing constitutional, statutory, case, or common-law rulings concerning what constitutes a matter of public concern." Laura Lee Prather & Justice Jane Bland, *Bullies Beware: Safeguarding Constitutional Rights Through Anti-SLAPP in Texas*, 47 TEX. TECH. L. REV. 725, 777–78 (2015). "[S]peech deals with a matter of public concern when, for example, 'it is a subject of legitimate news interest; that is a subject of general interest and of value and concern to the public. The arguably inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern.'" *Id.* at 778 (quoting *Snyder v. Phelps*, 562 U.S. 443, 453, 131 S. Ct. 1207, 1216 (2011)).

WL 1535669, at *2 (Tex. App.—Dallas Apr. 2, 2015, no pet.) (mem. op.) (article stating dentist had been charged with "defrauding state taxpayer of tens of millions of dollars in a Medicaid scam" related to provision of services in marketplace and constituted matter of public concern); *cf. Lahijani v. Melifera Partners, LLC*, No. 01-14-01025-CV, 2015 WL 6692197, at *4 (Tex. App.—Houston [1st Dist.] Nov. 3, 2015, no pet.) (mem. op.) (statements making "no mention of a service in the marketplace" concerned business dispute and not matter of public concern).

Mueller challenges the applicability of the TCPA, asserting that this case falls under the TCPA's exemption for commercial speech. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.010(b). The TCPA

> does not apply to a legal action brought against a person primarily engaged in the business of selling or leasing goods or services, if the statement or conduct arises out of the sale or lease of goods . . . or a commercial transaction in which the intended audience is an actual or potential buyer or customer.

*Id*. In determining whether the exemption applies, we examine whether:

(1)    the cause of action is against a person primarily engaged in the business of selling or leasing goods or services;

(2)    the cause of action arises from a statement or conduct by that person consisting of representations of fact about that person's or a business competitor's business operations, goods, or services;

(3)    the statement or conduct was made either for the purpose of obtaining approval for, promoting, or securing sales or leases of, or commercial transactions in, the person's goods or services or in the course of delivering the person's goods or services; and

20

(4)    the intended audience for the statement or conduct [is an actual or potential buyer or customer].

*Newspaper Holdings*, 416 S.W.3d at 88–89.  The burden of proving the applicability of the exemption is on Mueller, as the party asserting it.  *See id.* at 89.

Here, Mueller and Epperson, in their affidavits, established that Epperson is engaged in the business of authenticating and selling autographs.  *See id.* at 88.  And Epperson testified that his "primary business" is the "authentication of autographs." *See id*.

Next, the pleadings and evidence establish that Mueller's claims arise from Epperson's representations of fact about Mueller's goods.  *See id.*  Mueller, in his counterclaims, alleges that Epperson represented on internet forums that Mueller was selling "fake" and "forge[d]" autographs.  Mueller also alleges that Epperson contacted eBay and "falsely" represented that Mueller was "engaged in selling forged autographs" and had listed an item for sale that "infringed [on] a trademark." And Epperson, according to Mueller, "falsely" represented to Amazon.com representatives that Mueller was "engaged in the selling of forged autographs and/or fake sports memorabilia."  In his affidavit, Epperson himself testified that his comments concern "the quality of autographed music memorabilia that is or has been offered by Mueller."  *See id*.

21

Although Epperson argued that their "businesses do not compete in any meaningful way" because he sells music memorabilia and Mueller sells "a broad array of memorabilia," Epperson testified that his "comments" were "directed at" Mueller's "*music* autographs." (Emphasis added.) And Epperson testified that he does "buy and sell autographed memorabilia, as does [Mueller]." *See id.*

The evidence also establishes that Epperson's statements were made in the course of promoting or delivering his services. *See id.* Epperson testified, "The comments or publications that I have made regarding [Mueller] have all been from the point of view of an established authenticator of autographed memorabilia." His "observation and comment" regarding Mueller "has been done in the course of [his] . . . work as an autograph authenticator" and "has been based upon the actual offer of autographed memorabilia of [Mueller] that [Epperson] ha[s] studied in the course of [his] interest and work." Epperson notes that "[i]n a typical month, [he] professionally authenticate[s] approximately 250 to 300 signatures at the request of the autograph hobby community." And he is "regularly asked in forums about [his] opinion of authenticated memorabilia by collectors interested in memorabilia." Epperson explained that his statements "were in reply to another individual's posted question . . . concern[ing] the authenticity of memorabilia items" that Mueller had for sale. And Mueller, in his affidavit, testified that "[i]n the May 7 and 8, 2013

posts, *Epperson was responding to questions about the authenticity* of some of the . . . items [he] had for sale." (Emphasis added.)

Epperson argues that the complained-of statements do not constitute commercial speech because they simply arise from a "commercial relationship between the parties," and not from the "sale or lease of goods, services, or a commercial transaction." In support of his argument, he cites *Newspaper Holdings*.

In *Newspaper Holdings*, an assisted-living center and its owner brought several claims against a newspaper and its source, alleging that the paper had published defamatory statements. 416 S.W.3d at 75. The newspaper had published a series of articles, summarized in part as: "Month after month in 2010 complaints from residents and employees at the [assisted-living center] kept city and state inspectors returning to the building, investigating complaints of unsafe conditions, building disrepair, failure to provide services and verbal abuse of residents." *Id*. at 76. The newspaper, among others, moved to dismiss the suit pursuant to the TCPA, invoking its free-speech rights. *Id*. at 75. The plaintiffs contended that the newspaper was primarily engaged in the business of selling goods or services and "the challenged statements ar[o]se out of [its] provision of commercial services, thereby triggering the TCPA's exclusion for commercial speech." *Id*. at 88. This Court held that the exemption did not apply because although it was undisputed that the newspaper was in the business of reporting community events, the plaintiff's

complained-of statements "d[id] not arise out of the lease or sale of the goods or services that [the newspaper] sells—newspapers." *Id*. at 89. Here, not only is Epperson in the authentication business, but the complained-of statements arose out of those services. And Mueller presented evidence that Epperson is a bigger competitor in regard to "music autographs" and worked for R.R. Auctions, another competitor of Mueller.

Epperson asserts that the evidence does not show that he was compensated. However, nothing in the language of the "commercial speech" exemption requires evidence of compensation. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.010(b). Epperson further asserts that the evidence does not show that he overtly solicited the sale of a service or good. However, the "solicitation of a service or good is inherent in" the provision of the service. *NCDR, L.L.C. v. Mauze v. Bagby, P.L.L.C.*, 745 F.3d 742, 754–55 (5th Cir. 2014) (applying *Newspaper Holdings* and observing, "[f]or example, statements made while fixing a customer's roof would be exempted, but statements made while convincing a customer to hire the roofer to fix the roof would not"). "Otherwise, there would be a mostly arbitrary distinction created." *Id.*

Finally, the evidence shows that Epperson's intended audience was comprised of actual or potential buyers or customers. *See Newspaper Holdings*, 416 S.W.3d at 88. He testified that he participates on AML in order to reach "others interested in the field of music autographs." Epperson is particularly concerned with reaching

24

"the consumer who purchases autographed items." He notes that authenticity is an "ever present concern of the collection community and especially as it relates to *these buyers* who are eager and new to collecting." (Emphasis added.) And Epperson made the complained-of statements "in the course of internet forum discussions among various people interested in and concerned about the autograph hobby generally and the autograph authentication practice of [Mueller] in particular."

The evidence further shows that on May 7 and 8, 2013, Epperson, in the course of internet-forum discussions with autograph hobbyists and collectors, made the complained-of statements about items that Mueller then had up for auction online. Epperson made these comments while RR Auction, Mueller's competitor, had up for auction similar items that Epperson had authenticated. Epperson explained that RR Auction is "the largest auction house of autographed items in the world" and he has been its "music autograph authenticator for over 6 years."

Moreover, Mueller testified that Epperson's statements did in fact reach his actual customers:

> "MJ 1" was a photo signed by Michael Jackson that I sold at auction to a man by the name of Tom Stanford for the amount of $381.00. During that same time period, R&R Auction, a competitor of mine, sold a similar photo that Epperson authenticated for $853.00. Thus, I lost out on $472.00 of potential revenue because of Epperson's comments devaluing my item. More egregious is the fact that Tom Stanford read Epperson's comments and requested a refund, which I had to give, losing out on the entire sale!

25

Further, the complained-of comments include Epperson's response directly to one of Mueller's customers:

> I am sorry to hear about your dealings with [Mueller] of Colorado Springs Co[lorado,] as I am quite sure if you have bought any music autographs from him then you have bought fake autographs.

Epperson argues that the complained-of statements do not constitute commercial speech because his intended audience was the general public and not actual or potential buyers or customers. In support of his argument, he cites *Better Business Bureau of Metropolitan Dallas, Inc. v. BH DFW, Inc.*, 402 S.W.3d 299 (Tex. App.—Dallas 2013, pet. denied). In *Better Business Bureau*, the court held that the commercial speech exemption did not apply to a business review because the intended audience of the Better Business Bureau ("BBB") was the general public and not an actual or potential buyer or customer. *Id.* at 309. As the court noted, the BBB was in the business of selling its accreditation services to businesses. *Id.* at 302. Thus, the actual and potential buyers or customers of the BBB's services were the businesses, not the general public. *Id.* at 309. Here, by contrast, Epperson's intended audience was comprised of actual or potential buyers or customers of autograph memorabilia. *Cf. Schimmel*, 438 S.W.3d at 857–58 (holding commercial-speech exemption not applicable where, although defendant provided legal services to plaintiff at time he made statements at issue, his intended audience was City of Galveston, not a potential buyer or customer of attorney's services).

26

We conclude that the TCPA's commercial-speech exemption applies to the complained-of statements of Epperson.  Accordingly, we hold that the trial court did not err in denying Epperson's motion to dismiss Mueller's counterclaims.

We overrule Epperson's sole issue.

## Conclusion

We affirm the order of the trial court.


Terry Jennings
Justice

Panel consists of Justices Jennings, Keyes, and Bland.