Memorandum Opinion by Justice Garza
This is the second appeal arising from the denial of a summary judgment motion in a defamation case. Appellants Scripps NP Operating, LLC, successor in interest to Scripps Texas Newspapers, LP, d/b/a *6 Corpus Christi Caller-Times (the "Caller-Times ") and the E.W. Scripps Company ("E.W. Scripps") contend by sixteen issues that the trial court erred by denying their second motion seeking summary judgment in a suit brought by appellee Terry Carter.
We find that the statements at issue are defamatory per se. However, though the evidence may support a finding that appellants were negligent in their reporting, it does not support a finding that they acted with actual malice. Accordingly, we affirm in part and reverse and render in part.
I. BACKGROUND
Carter served as the president and chief executive officer of the Corpus Christi Chamber of Commerce (the "Chamber"). Between February 15 and June 13, 2008, the Caller-Times published twenty-five newspaper articles, including one editorial, reporting that Carter had been accused of financial improprieties by other Chamber officials.
Carter filed suit against appellants and others for defamation, conspiracy, breach of fiduciary duty, and breach of contract, alleging that the articles "falsely accus[ed him] of mismanagement, financial improprieties, and of stealing a tape recording of a [Chamber of Commerce] board meeting."
Appellants moved for no-evidence and traditional summary judgment on grounds that there was no evidence of actual malice, but the trial court denied the motions. Appellants appealed, arguing that Carter was a public figure and was thus required to prove actual malice, but we disagreed and affirmed the trial court's ruling. See Scripps Tex. Newspapers, LP v. Carter , No. 13-09-00655-CV, 2012 WL 5948955, at *1 (Tex. App.-Corpus Christi Nov. 21, 2012, pet. denied) (mem. op.).[1] We reasoned that (1) Carter's position as Chamber CEO did not, alone, make him a public figure, and (2) he was not a limited-purpose public figure because the alleged defamatory articles were "not germane to Carter's participation in the controversy" at issue-namely, whether the mayor of Corpus Christi gave the city council enough time to consider a tax incentive proposal. Id. at *2-5 ("[W]e apply a three-part test in deciding whether [a] person is ... a limited-purpose public figure: (1) was the controversy at issue public both in the sense that people were discussing it and people other than the immediate participants in the controversy were likely to feel the impact of its resolution; (2) did the plaintiff have more than a trivial or tangential role in the controversy; and (3) was the alleged defamation germane to the plaintiff's participation in the controversy."). Because Carter was not a public figure, he did not need to prove actual malice, and because the only ground raised in appellants' summary judgment motions was the absence of evidence of malice, the trial court did not err in denying summary judgment. Id.
On remand, appellants again moved for no-evidence and traditional summary judgment. This time, appellants argued that the alleged defamatory articles were not actionable because they were: (1) not defamatory, (2) substantially true, (3) statements *7 of opinion, (4) privileged as fair reports of judicial proceedings, and (5) published without negligence. The motion further argued that E.W. Scripps did not publish the articles in question. Appellants attached over 100 exhibits to their motion, comprising over 1,100 pages; Carter filed a response accompanied by over 11,000 pages of exhibits, consisting primarily of the entire clerk's record from the 2012 appeal. The trial court again denied summary judgment, and this appeal followed. See TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(6) (West, Westlaw through 2015 R.S.) (permitting immediate appeal of interlocutory order denying a motion for summary judgment made by a media defendant that is based on the free speech or free press clause of the First Amendment).[2]
II. DISCUSSION
A. Standard of Review and Applicable Law
We review the denial of summary judgment de novo. Neely v. Wilson , 418 S.W.3d 52, 59 (Tex. 2013) ; Nalle Plastics Family L.P. v. Porter, Rogers, Dahlman & Gordon, P.C. , 406 S.W.3d 186, 199 (Tex. App.-Corpus Christi 2013, pet. denied). In doing so, we review the evidence in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion. Neely , 418 S.W.3d at 59 ; City of Keller v. Wilson , 168 S.W.3d 802, 824 (Tex. 2005). The party moving for summary judgment bears the burden of proof. Neely , 418 S.W.3d at 59 (citing Roskey v. Tex. Health Facilities Comm'n , 639 S.W.2d 302, 303 (Tex. 1982) ).
Appellants' summary judgment motion was brought on both no-evidence and traditional grounds. See TEX. R. CIV. P. 166a(c), (i). Though the burden varies for traditional and no-evidence summary judgment motions, all parties here brought forth summary judgment evidence; therefore, the differing burdens are immaterial and the ultimate issue is whether a fact issue exists. Neely , 418 S.W.3d at 59 (citing Buck v. Palmer , 381 S.W.3d 525, 527 n.2 (Tex. 2012) ). A fact issue exists, thereby precluding summary judgment, if there is more than a scintilla of probative evidence to support the plaintiff's claim. Id. Evidence is more than a scintilla if it "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." Serv. Corp. Int'l v. Guerra , 348 S.W.3d 221, 228 (Tex. 2011). Evidence is less than a scintilla is if it is "so weak as to do no more than create a mere surmise or suspicion that the fact exists." Regal Fin. Co. v. Tex Star Motors, Inc. , 355 S.W.3d 595, 603 (Tex. 2010).
To recover defamation damages in Texas, a non-public-figure plaintiff must prove that the media defendant: (1) published a statement; (2) that defamed the plaintiff; (3) while acting with negligence regarding the truth of the statement. Neely , 418 S.W.3d at 61 ; WFAA-TV, Inc. v. McLemore , 978 S.W.2d 568, 571 (Tex. 1998). We construe an allegedly defamatory publication as a whole in light of the surrounding circumstances and based upon how a person of ordinary intelligence would perceive it. Turner v. KTRK Television, Inc. , 38 S.W.3d 103, 114 (Tex. 2000). A "person of ordinary intelligence" is one who "exercises care and prudence, but not omniscience, when evaluating allegedly defamatory *8 communications." New Times, Inc. v. Isaacks , 146 S.W.3d 144, 157 (Tex. 2004).
B. Summary Judgment Evidence
Carter's 2004 employment contract with the Chamber provided that he was entitled to a "performance bonus" of $7,000 "based on [his] attainment of financial goals" for the Chamber as set forth elsewhere in the contract. An amendment to the contract was signed in 2005 that increased Carter's base salary but left the performance bonus provision intact. In deposition testimony, Carter agreed that, based on the 2004 contract and 2005 amendment, his performance bonus "had some connection to the financial performance of the Chamber." He stated: "If I bankrupted the [Chamber], it would certainly have an adverse effect." In 2007, however, the parties executed another amendment to the contract providing that Carter's performance bonus would be $10,000 and would not be based on the attainment of financial goals, but would instead "be made to Carter as soon as feasible, after ratification of this contract."
In 2007, investors planned to develop a mall in Corpus Christi called Crosstown Commons and requested $40 million in tax incentives from the city, which included tax rebates and reimbursements for road and utility improvements. Scripps , 2012 WL 5948955, at *1. The city council was asked to vote on the $40 million tax incentive. Id. Patrick Birmingham, publisher and president of the Caller-Times at that time, supported the tax proposal. At a city council meeting on June 12, 2007, Carter suggested that the city council "slow down" its decision on the tax incentives. He noted in deposition testimony that the city council had been given only four days prior to the meeting to consider the proposal.
On December 19, 2007, the Caller-Times published an article stating that it was cancelling its own membership with the Chamber, effective on December 31, "because of differences with [Carter]." The article reported that Birmingham had sent a letter to Freddie Martinez Jr., chairman of the Chamber's board of directors, stating that Carter was a "divisive influence." The letter further stated as follows:
I believe strongly that the role of a chamber and its president should be to unite the business community, work with government officials to foster growth and, when called for, be an advocate for the business community-all of the business community, both existing companies and new companies trying to enter the market.
I find the actions of your president to be contrary to these beliefs. Therefore, I can no longer in good conscience permit the Caller-Times to be a member of an organization with a president who actively engages in name calling and shows favoritism toward one business over another.
The December 19 article quoted Birmingham as saying: "I don't think [Carter] represents the interests of the business community nor the company.... The only way to show he doesn't speak for the Caller-Times is not to be a member of the organization." The article further stated:
Birmingham's letter did not mention Carter's prominent role in the opposition to the proposed Westside outdoor mall project known as Crosstown Commons, but Birmingham said it was one example of Carter's favoritism.
The mall faced opposition from local retail landlords as it successfully sought city incentives for its proposed infrastructure investment. Carter's and Martinez's roles in opposing the requested incentives prompted Fulton Coastcon, a *9 powerful and prominent construction partnership, to resign from the chamber in June. Parting comments by long-time Fulton Coastcon partner Jim Barnette, a former chamber chairman, were similar in substance and tone to Birmingham's letter.
Subsequently, on February 10, 2008, Birmingham sent an email to vice-president Libby Averyt and editor Shane Fitzgerald complaining of the appearance of a photograph of Carter on the front page of Hola , the newspaper's Sunday supplement.[3]
Meanwhile, at a January 28, 2008 meeting of the Chamber's board of directors, the executive committee of the board approved a motion to "review [Carter]'s contract and compensation and present results to full board at next meeting for approval." Martinez testified in a deposition that some members of the Chamber had complained to him about Carter's "strong" and "aggressive" leadership style.
Martinez testified that, in January 2008, Carter had presented financial statements showing that the Chamber had been profitable in 2007. Martinez asked the Chamber's treasurer, Damon Bentley, to review the statements provided by Carter as well as the Chamber's "overall financial health." Subsequently, Bentley, along with Chamber executive board member Judy Hawley and former chair Sylvia Whitmore, sent a letter to Martinez asking him to convene an executive committee meeting regarding the financial statements.
The meeting was held on February 15, 2008. Just prior to the meeting, Carter encountered Bentley outside the meeting room and asked him to wait outside while he met with Hawley and Whitmore. Carter and Martinez, along with the Chamber's attorney Van Huseman, then informed Hawley and Whitmore that they were no longer eligible to serve on the board's executive committee and therefore would not participate in the committee's recommendation to the board regarding Carter's contract and compensation.
An audio recording of the February 15 meeting was made. According to the transcript of the recording, Carter and Bentley engaged in a heated exchange in which Carter demanded to know whether Bentley was accusing him of intentionally misleading the board or misappropriating funds for personal use.[4] Bentley denied accusing Carter of intentional wrongdoing but stated that he simply wanted to present his findings of fact. Carter then left the meeting.
Bentley explained to the rest of the executive committee that Carter's contract and any potential performance bonus would be "directly linked to the performance of the financials" but that he "became concerned" about the 2007 financial statements because they showed that portions of Carter's compensation for October, November and December of 2007-amounting to $19,992-had been deferred. Bentley further stated that Carter had asked an assistant "to forego his pay in October *10 because we were under a financial strain" but "[i]t was never on the balance sheet or the income statement." He explained that an accountant had raised questions as to whether the Chamber was operating on a cash basis, an accrual basis, or a modified accrual basis for accounting purposes.[5]
Bentley discussed other potential improprieties at the February 15 meeting, such as using foundation funds for expenses and transferring $18,000 to the foundation from a designated building fund. He stated:
We've got a ... building fund; we've got a Chamber foundation that are on a different category for tax purposes, and we're using it to pay off expenses, which we didn't use the previous year. We didn't do that the previous year. If we did this the previous year, I'd say, okay, we're doing the thing with accounting-and I'm not an accountant, but whatever you did last year, you got to do it this year because otherwise we could take the whole kit and caboodle of the foundation money, shift it over into the Chamber and tell our whole board we just made $80,000 and give the guy a $500,000 bonus.
Bentley stated that the Chamber's foundation had never presented financial statements, and that "the big picture is we were presented a $40,000 deal.... But, in reality if you start bringing stuff down because of actual correct accounting processes, you're at a zero or a minus, and maybe even a really big minus." He stated that "the by-laws require audits to be completed each year," but "2007 has not received an audit."
Bentley recommended that the Chamber, its foundation, and its building fund undergo "a complete and thorough audit from an outside accounting agency." He stated that "accounting practice needs to be implemented to ensure transparent financial transactions." Bentley also stated that "I've lost trust in [Carter], and I don't think he should be the CEO of the [Chamber]." The other members of the executive committee agreed that an audit was necessary.
Later in the meeting, Darrell Thompson, an accountant retained by the Chamber, was asked whether the concerns previously expressed at the meeting would have an effect on the Chamber foundation's status as a nonprofit organization for tax purposes. Thompson stated that "individual inurement"-which he defined as benefitting personally from a donation made to the organization-was a concern and that "[i]f your bonuses are going to be based on how well you do, which it is for us, okay, you may have a problem."
Carter testified that the audio tape of the meeting was given to him following the meeting, and he left the building with the tape. Bentley stated that he attempted to obtain a copy of the tape, but was unsuccessful. On February 16 and for several days after, Caller-Times employees exchanged emails with the subject line, "Terry Carter Watch for Resignation."
On February 17, 2008, Carter sent a letter to the board addressing the alleged irregularities. He stated in part that he deferred portions of his compensation in 2006 and 2007 for tax reasons and notified the board in October 2007 of his intention to do so; that the deferred compensation *11 should have been shown as liabilities for 2007 but were not; and that he himself found the error during the January 2008 executive committee meeting and brought it to the attention of Bentley. The letter stated that, since 2004 and with the approval of the board, he has been using a modified accrual basis for accounting purposes under which revenue is recorded when received but certain expenses are recorded when accrued. Carter additionally stated that he transferred funds from the building fund to the foundation in consultation with the board's accountant, who confirmed that "there were never any restrictions placed on the building fund." Finally, Carter stated that he used a portion of the building fund, after it was transferred to the foundation, to pay certain Chamber operating expenses.
On February 20, the entire board met to discuss the issue. Bentley gave a PowerPoint presentation detailing his concerns. The presentation noted that Carter deferred his pay for November and December 2007 ostensibly for tax purposes and that the deferred pay was "not shown on the 2007 books as a payable," but that the Chamber's finance director corrected this by "ma[king] an adjustment to the books for a minus $19,992." The presentation further stated that, on October 31, 2007, the Chamber invoiced the foundation for $18,312.87 for expenses incurred by the Chamber between January and October 2007,[6] but that neither the executive committee nor the board as a whole had voted to bill the foundation for these expenses, and that, according to the foundation's president, such billing did not occur in 2006. As to the building fund, Bentley's presentation stated that on November 14, 2007, $18,312.87 was disbursed from the fund to the foundation in order to pay the Chamber's invoice, and that this amount had previously been booked as an expense reimbursement in October on the Chamber's financial statements.
The presentation stated that the building fund was established with proceeds from the sale of the Chamber's property, that it was to be used for building improvements or a new location for the Chamber, and that using building funds "for utilities expenses is inconsistent with this objective." It stated that neither the executive committee nor the board had voted for the building fund to be used for the Chamber's operating expenses, and that this could be a "serious problem" according to the accountant if it was used to increase the net operating income linked to a performance bonus. It also stated that $63,903 of "renewed 2008 [membership] dues were booked in December 2007 vs 2008," and that "[t]herefore, 2007 received the benefit of both Jan[uary] 2007 and Jan[uary] 2008 renewed dues. In summary, the presentation stated that the net operating income of $40,425 as shown on the 2007 financials should be adjusted to a net operating loss of $61,782, for "a $102,207 swing."[7]
At the conclusion of the board meeting, Martinez recommended that the review of Carter's job performance be postponed until the audits for 2006 and 2007 could be completed. Later, in a letter[8] to the board *12 dated February 26, 2008, Bentley disputed Carter's February 17 letter and stated: "It is undeniable the financials for 2007 as presented to the Executive Committee and Board are inaccurate, inconsistent with the process used in previous years and a misrepresentation of the Chamber's bottom line."
On February 28, Whitmore sent a letter to the board stating in part that Carter's letter had "gloss[ed] over the financial irregularities and the declining membership numbers" and that Bentley's "concerns are very credible, and appeared to be mostly ignored." Whitmore also expressed concern about "obstruction" including the "refusal of [Carter] to release the tape of the Executive Committee meeting which was held on February 15." Various Chamber members petitioned for a special meeting to address the allegations.
On March 18, Bentley sued Carter and the Chamber and obtained a temporary restraining order enjoining them from destroying the audio recording of the February 15 executive committee meeting. The next day, Carter filed the instant lawsuit against the Chamber, Bentley, Hawley, Whitmore, and appellants, alleging tortious interference with existing contact, tortious interference with prospective relations, defamation, and conspiracy.
On March 25, the Chamber adjusted its 2007 financial statements to reflect a net operating loss of $95,377.76, reflecting a total decrease from the net amount reported by Carter of $135,803.24. At a special board meeting on March 26, 2008, Carter was placed on administrative leave with pay, and after reaching a severance agreement, he resigned as Chamber CEO on April 30, 2008.
In August 2008, the Chamber retained an independent accountant to audit the 2007 financial statements. The auditor, Jake Sanchez, issued a report on December 12, 2008, which stated in part:
I have audited the accompanying statement of financial position of the Corpus Christi Chamber of Commerce (a non-profit organization) as of December 31, 2007, and the related statements of activities, functional expenses, and cash flows for the year then ended. These financial statements are the responsibility of the Organization's management. My responsibility is to express an opinion on these financial statements based on my audit.
I conducted my audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that I plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. I believe that my audit provides a reasonable basis for my opinion.
In my opinion, the financial statements referred to above present fairly, in all material respects, the financial position of the Corpus Christi Chamber of Commerce as of December 31, 2007, and the changes in its net assets and cash flows for the year then ended in conformity with accounting principles generally accepted in the United States of America.
Sanchez's report also included a document entitled "Audit Summary, Findings & Recommendations", which were accompanied by a letter stating in part:
Professional standards require us to accumulate all known and likely misstatements *13 identified during the audit, other than those that are trivial, and communicate them to the appropriate level of management. Management has corrected all such misstatements. The misstatements detected as a result of audit procedures and corrected by management were material, either individually or in the aggregate, to the financial statements taken as a whole.
The findings also included a document entitled "Communication of Significant Deficiencies and Material Weaknesses" stating in part:
A material weakness is a significant deficiency, or a combination of significant deficiencies, that results in more than a remote likelihood that a material misstatement of the financial statements will not be prevented or detected by the entity's internal control. I believe that the following deficiencies constitute material weaknesses.
The report then listed the following "deficiencies": (1) $95,982 was transferred from the Chamber's building fund account to its operations account and used for expenses, which was a "breach of the intended purpose of the funds"; (2) Carter "did not completely document the Board of Directors' oversight of the Chamber"; and (3) the "staff-prepared financial statements had material misstatements" which were "due to omissions, accounting applications and or lack of current accounting requirements."
C. Alleged Defamatory Statements
On, February 15, 2008-the day of the executive committee meeting called at Bentley's request-Caller-Times reporter Jaime Powell received a tip from Ruben Bonilla, a local attorney whom Powell had known to be a reliable source, that there was "something going on" with the Chamber. The newspaper's business editor, Tom Whitehurst, assigned business reporter Elvia Aguilar to assist Powell in her investigation. That day, an article by Powell ran on the Caller-Times website stating in part that "[t]hree high-ranking Corpus Christi Chamber of Commerce officials raised what they describe as serious financial and management issues Friday." The article went on to state in part:
After demanding an emergency meeting Friday of the chamber's executive committee to air their concerns, two of the three officials, Judy Hawley and Sylvia Whitmore, were told they are no longer eligible to serve on the executive committee, Hawley said.[9] However, they were asked to present their information, in a meeting that lasted most of Friday morning and from which chamber President Terry Carter could be heard shouting.
No chamber officials would discuss the nature of the financial issues. The concerns arose after chamber chairman-elect Robert Gonzalez recommended a raise, bonus and contract extension for Carter in January and executive committee treasurer Damon Bentley was asked to review the chamber's financial standing, Hawley said.
The article quoted Bentley as stating "there are both serious financial and management issues that we need to address." It stated that Huseman had "described the financial questions as business practice-related, not improprieties."
On February 16, 2008, the article ran in the print version of the newspaper with *14 additional content stating in part that the Chamber "will audit its business and financial practices in response to concerns raised by three top officials involved in reviewing president Terry Carter's contract." The print article contained additional details regarding the prior day's executive committee meeting, Hawley's and Whitmore's removal from the committee, and the financial questions surrounding the Chamber. The article noted: "Had there been a vote, it would have been 3-2 to refrain from a raise, bonus and contract extension for [Carter], with Bentley, Hawley and Whitmore in the majority, until a complete financial picture could be put together, Hawley said." It quoted Gonzalez as saying: "We are going to conduct our yearly audit of the chamber and that will give us the results of 2007.... Frankly I am going to rely on the audit to answer any further questions. ln the end the audit will tell us the real facts behind the chamber's 2007 year."
On February 20, 2008, a brief article explained that the Chamber's executive committee called a special meeting, to be followed by a meeting of the full board, to "discuss financial irregularities discovered during a performance review of [Carter] after a raise and bonus for Carter had been proposed."
On February 21, 2008, the Caller-Times reported that the Chamber had decided "to conduct a full audit, after what have been described as financial irregularities were uncovered while reviewing a proposed raise and bonus for [Carter]."
On February 27, 2008, an article by Aguilar ran in the print edition stating that "[Carter], whose bonus is based on financial performance, shifted funds to make a loss look like a profit, according to a letter by the chamber's treasurer." The article gave details contained in Bentley's February 26 letter concerning the alleged irregularities in the 2007 financial statements prepared by Carter. The article stated that "[d]uring the meeting, which was tape-recorded, Carter seized the tape and left the building, according to Bentley's letter and witness accounts."
Another article, which was published in print on February 29, 2008, recounted details from Whitmore's February 28, 2008 letter. It noted that Whitmore had expressed her concern that Carter's February 17 letter "gloss[ed] over financial irregularities and the declining membership numbers." It also quoted Carter's letter as stating: "The articles which recently ran in our local newspaper are an over dramatized account of nothing more than our board's routine and normal review of the Chamber financial records. There are absolutely no allegations or suggestions of any misappropriation or misuse of funds."
On March 2, the Caller-Times ran an unsigned editorial in its Opinion section with the headline "Chamber CEO's actions raise serious questions" and the sub-headline "Funds were shifted that made a loss look like a profit, entitling CEO to bonus."[10] The editorial stated that there were "reports about highly questionable stewardship of the financial affairs of the chamber by Carter," including "duplicitous dealings with the membership and the executive committee" and "high-handed tactics" that "possibly risk[ ] the chamber's nonprofit status" and "have done severe damage to a very important civic organization." The editorial opined that "[t]he removal of Hawley and Whitmore, by a convenient, for Carter, rereading of the *15 bylaws is nothing less than an attempt to intimidate critics of his conduct." It further stated:
Carter's explanation, made in a letter to board members, is that the fund-shifting was allowed by the chamber's accounting methods, that the deferral of salary was for tax purposes with the failure to show deferral properly on the books explained as a bookkeeping error. The use of capital money from the chamber's foundation for operating expenses, Carter said, had been discussed with the chamber's accountant. But that accountant, Darrell Thompson, Bentley wrote, warned that the use of foundation money in such a way would threaten the chamber's nonprofit status.
The editorial concluded:
The chamber can be an effective and creditable voice for the business community only if its leadership conducts itself in an ethical and professional manner, accountable to its members and holding itself to the same businesslike standards that its members expect of themselves. Intimidation, secrecy and duplicity discredit a vital organization. The question mark remains over Carter until he fully explains his actions, or until the chamber chooses to move on without him.
Articles published on March 3 and March 4 reported on the petition signed by various Chamber members seeking a general meeting to discuss the allegations. On March 8, the Caller-Times reported that the Chamber's board had decided "to enter discussions" with Carter regarding the concerns raised "about his leadership." The article noted that Carter "did not return calls to his work and cell phone" regarding the story. On March 19 and March 20, the newspaper reported about the temporary restraining order granted to Bentley and the lawsuit filed by Carter. The Caller-Times reported on March 27 that Carter had been placed on paid administrative leave, on May 2 that the Chamber had made an offer to Carter "to settle a contract dispute," and on May 23 that the Chamber had reached a severance agreement with Carter and had accepted Carter's resignation. An additional article ran on May 28 describing the proceedings in the lawsuits. Finally, on May 31, 2008, an article was published explaining that the Caller-Times had obtained a copy of the audio recording of the February 15 executive board meeting. It describes the recording as containing a "contentious exchange between [Carter] and other chamber officials."
Whitehurst stated in an affidavit that he directed Powell and Aguilar to pursue the story because he "believed it to be newsworthy in that it pertained to one of our community's most important local organizations, the Chamber of Commerce," and its CEO and president. He stated that "[t]he fact that high-ranking Chamber officials" such as Hawley, Whitmore, and Bentley "were raising questions regarding the CEO and President of Chamber made the matter newsworthy, which I believed would be of interest and concern to the public, given the important role that the Chamber plays in our community."
Carter argues that the report by Sanchez, the independent auditor, showed that "[a]ll of the accusations against Carter were proved baseless." He points to the report's declaration that "the financial statements referred to above present fairly, in all material respects, the financial position of the Corpus Christi Chamber of Commerce as of December 31, 2007." Carter argues that, although Sanchez's report reflects that "misstatements" were made which were "material, either individually or in the aggregate, to the financial statements as a whole," Sanchez "never identifies the nature of the misstatements, who *16 made them, how material they were, or describes any effects on the bottom-lines of the financial statements." Carter notes that the Caller-Times never reported on Sanchez's findings.
In an affidavit, Carter identified eight specific articles-those published on February 20, 21, 27, and 29, and March 2, 3, 4, and 8, 2008-and stated that these articles "alleged or implied financial malfeasance by me," "implied or insinuated that I committed" violations of the penal code, "caused me enormous harm" including the loss of his job, "extreme mental anguish" and "over $1 million in lost income," and were false. Carter stated that he had a telephone conversation with Birmingham in which Birmingham "threatened" him by saying: "[D]on't mess with the man who buys ink by the barrel."
D. Analysis
On appeal, appellants raise the following sixteen issues arguing that the trial court erred in denying its second summary judgment motion: (1) the articles were not defamatory; (2) there is no evidence that the articles were defamatory; (3) the articles were substantially true; (4) there was no evidence that the articles were not substantially true; (5) the articles were non-actionable opinion; (6) there was no evidence that the articles were not opinion; (7) the articles were privileged fair reports of judicial proceedings; (8) there was no evidence that the articles were not privileged fair reports of judicial proceedings; (9) the articles were published without negligence; (10) there was no evidence that the articles were published with negligence; (11) the articles were published without actual malice; (12) there was no evidence that the articles were published with actual malice; (13) summary judgment was warranted on Carter's non-defamation claims; (14) there was no evidence to support Carter's non-defamation claims; (15) E.W. Scripps did not publish the articles; and (16) there was no evidence that E.W. Scripps published the articles.
1. Defamatory Statement
We first address appellants' issues regarding whether the publications were defamatory. The Texas Civil Practice and Remedies code defines "libel" as follows:
a defamation expressed in written or other graphic form that tends to blacken the memory of the dead or that tends to injure a living person's reputation and thereby expose the person to public hatred, contempt or ridicule, or financial injury or to impeach any person's honesty, integrity, virtue, or reputation or to publish the natural defects of anyone and thereby expose the person to public hatred, ridicule, or financial injury.
TEX. CIV. PRAC. & REM. CODE ANN. § 73.001 (West, Westlaw through 2015 R.S.). Defamatory statements may be either defamatory per se or defamatory per quod. Main v. Royall , 348 S.W.3d 381, 390 (Tex. App.-Dallas 2011, no pet.). A written defamatory statement is libel per se if the words in and of themselves are so obviously hurtful to the person aggrieved by them that they require no proof of injury. Id. These include statements that (1) unambiguously charge a crime, dishonesty, fraud, rascality, or general depravity, or (2) are falsehoods that injure one in his office, business, profession, or occupation. Id. If the court must resort to innuendo or extrinsic evidence to determine that the statement was defamatory, then it is libel per quod and requires proof of injury and damages. Id. (citing Moore v. Waldrop , 166 S.W.3d 380, 384 (Tex. App.-Waco 2005, no pet.) ).
We determine whether a statement is reasonably capable of a defamatory *17 meaning from the perspective of an ordinary reader in light of the surrounding circumstances. Hancock v. Variyam , 400 S.W.3d 59, 66 (Tex. 2013) (citing Musser v. Smith Protective Servs., Inc. , 723 S.W.2d 653, 655 (Tex. 1987) ). If the statement is not reasonably capable of a defamatory meaning, the statement is not defamatory as a matter of law and the claim fails. Id. Likewise, the determination of whether a statement is defamatory per se is first an inquiry for the court. Id. If the court determines that a statement is ambiguous or of doubtful import, the jury should determine the statement's meaning. Id.
Appellants first argue that the articles are not defamatory per se because they "may not reasonably be read to imply or impute a crime to Carter." They note that the first article at issue, published on February 15, 2008, quoted Huseman as describing the issues as "business practice-related, not improprieties." They further note that the articles did not explicitly use words such as "stolen," "theft," "misappropriation," "fraud," "malfeasance," or "corrupt." Appellants note that other articles, including those published on February 27 and March 20, explained Carter's position regarding the 2007 financial statement, thereby "clarif[ying] that the matter is a civil dispute over accounting practices, not a criminal matter."
Appellants further argue that the articles do not injure Carter in his profession. They point to KTRK Television, Inc. v. Robinson , in which the media defendant published statements raising questions about "millions in taxpayer dollars" that "cannot be accounted for," and noting that the plaintiff, the owner of a day-care service for special-needs children, "did not provide proper financial records to account for over $3 million in state funding for the past year." 409 S.W.3d 682, 686 (Tex. App.-Houston [1st Dist.] 2013, pet. denied). The First Court of Appeals held that the statements were not defamatory per se because "[t]here is nothing intrinsically defamatory about [the] reports on the State's investigation into [plaintiff's] mismanaged funds." Id. The court noted that the statements "did not say or imply that the entire $3 million in state funds had been misappropriated or embezzled. Rather, the statements speak to the insufficiency of financial records to account for spent state funds." Id. Appellants argue that the instant case is analogous in that "there is nothing intrinsically defamatory in reporting concerns by Chamber leaders over financial management and accounting practices under Carter's watch."
We disagree. Although the articles, by and large, are careful to attribute allegations to particular sources, the impression left by the articles taken together is certainly one which a reader of ordinary intelligence could perceive as defamatory. See Turner , 38 S.W.3d at 114. An article published online on February 20, 2008 stated that the Chamber's "executive committee is meeting to discuss financial irregularities discovered during a performance review of [Carter] after a raise and bonus for Carter had been proposed." The February 27 article, which appeared on page 1A of the print edition, stated that "[Carter], whose bonus is based on financial performance, shifted funds to make a loss look like a profit, according to a letter by the chamber's treasurer." The article was entitled "Chamber CEO shifted funds, letter says," and was accompanied by the subtitle, "Move makes loss appear to be profit, treasurer writes." A photograph of Carter appeared next to the article and was captioned: "Carter's 2006 salary was $137,000 plus benefits and expenses." The article extensively quoted Bentley's February 26, 2008 letter accusing Carter of, among other things, "[r]emoving executive committee *18 members who voice sincere concerns, keeping taped meetings from other board members, yelling in an attempt to intimidate board volunteers ... and attempting to justify a raise based on disputable numbers...." Finally, the March 2, 2008 editorial was subtitled "Funds were shifted that made a loss look like a profit, entitling CEO to bonus" and explicitly stated that, according to prior "news accounts," Carter engaged in "duplicitous dealings" and "high-handed tactics" which have "done severe damage" to the Chamber. The articles, taken together, clearly attempt to demonstrate that Carter acted improperly in his role as CEO of the Chamber by making false financial statements in order to personally enrich himself under his contract with the Chamber. The articles further suggest that Carter attempted to block any inquiry into his actions by "seizing" the audio recording of the February 15 meeting, and by taking potentially illegitimate steps to remove Hawley and Whitmore from their board positions. The articles go beyond merely raising questions or suspicion based on incomplete information, as was the case with the alleged defamatory statements in Robinson . See ids="11121123" index="32" url="https://cite.case.law/sw3d/38/103/#p114">id.
Appellants argue that the articles do not "explicitly or unambiguously" suggest that Carter committed a crime. See Main , 348 S.W.3d at 390. However, when taken together, we find that the articles implicitly suggest that Carter committed theft and made false statements to obtain property. See TEX. PENAL CODE ANN. §§ 31.03, 32.32 (West, Westlaw through 2015 R.S.). Appellants further contend that the newspaper's statement that Carter "shifted funds" does not injure Carter in his profession, but rather is "a disparagement equally discreditable to a person in any business or occupation." They cite Shipp v. Malouf , in which it was held that an allegation of personal bankruptcy against a dentist was not defamatory per se because "[a] statement that a dentist is personally bankrupt does not adversely affect the dentist's fitness to practice dentistry-he may be a great dentist but a bad businessman." 439 S.W.3d 432, 441 (Tex. App.-Dallas 2014, no pet.), disapproved on other grounds by In re Lipsky , 460 S.W.3d 579, 587 (Tex. 2015). We disagree. Carter was the Chamber's CEO and was therefore ultimately responsible for the organization's finances. A report that Carter misrepresented the Chamber's finances for his own pecuniary gain, "seized" an audio recording of a meeting regarding his action, and then attempted to intimidate critics of his conduct, is directly relevant to his fitness to serve as a chief executive of a non-profit organization. Shipp is therefore distinguishable. See 439 S.W.3d at 441.
For the foregoing reasons, we conclude that the statements, taken as a whole and in light of the surrounding circumstances, are defamatory per se. See Main , 348 S.W.3d at 390. Appellants' first and second issues are therefore overruled.
2. Substantial Truth
By their third and fourth issues, appellants argue they are entitled to summary judgment because the statements at issue are true or substantially true. "The truth of the statement in the publication on which an action for libel is based is a defense to the action." TEX. CIV. PRAC. & REM. CODE ANN. § 73.005(a) (West, Westlaw through 2015 R.S.). The test used in determining whether a publication is substantially true involves considering whether the alleged defamatory statement was more damaging to the plaintiff's reputation, in the mind of the average reader or listener, than a truthful statement would have been. McIlvain v. Jacobs , 794 S.W.2d 14, 16 (Tex. 1990). This evaluation *19 involves looking to the "gist" of the publication. Id. To prevail at summary judgment on the truth defense, the publisher must conclusively prove that the "gist" of the publication is substantially true. Neely , 418 S.W.3d at 66.
Appellants note that the articles accurately summarized Bentley's position as stated in his February 20 PowerPoint presentation and February 28 letter, and they argue that "publishing Bentley's letter or PowerPoint presentation in full would not have caused the ordinary reader to form a better impression of Carter than would the Articles." That may be so, but the point of Carter's suit is that the allegations made in Bentley's letter and PowerPoint presentation are themselves untrue. The record contains more than a scintilla of evidence to support that position. In particular, despite Bentley's insinuations that Carter had incorrectly reported a profit in order to obtain a bonus, Carter's 2007 contract did not, in fact, provide that his bonus was dependent on the financial performance of the Chamber. Moreover, the report provided by the independent auditor, Sanchez, was ambiguous as to whether the financial statements prepared by Carter contained irregularities or inaccuracies. Sanchez's report stated that the Chamber's 2007 financial statements contained several "deficiencies"; however, the report also stated that the statements "present fairly, in all material respects, the financial position of the [Chamber]." Sanchez's report does not conclusively show that Bentley's allegations were true or that they were false, but rather creates a fact issue in that regard which must be resolved by a jury.
Appellants further argue that the articles are not actionable because they are substantially true reports of allegations-that is, even if Bentley's allegations were false, summary judgment is nevertheless proper because the articles merely reported that the allegations had been made, not that they were true.[11] Appellants cite Global Relief Foundation, Inc. v. New York Times Co. , 390 F.3d 973, 985-87 (7th Cir. 2004), for the proposition that "[w]here a media defendant accurately reports third-party allegations against a plaintiff, while including the plaintiff's denials and without stating a conclusion of guilt, the reports are substantially true even if the plaintiff disputes the third-party allegations." In that case, Global Relief, a charity, sued various media defendants alleging that they had falsely reported that Global Relief had funded terrorism, leading to a decline in donations to the charity. Id. at 974-75. The federal Seventh Circuit Court of Appeals found that summary judgment on behalf of the media defendants was proper because, even though Global Relief raised a fact issue as to whether it funded terrorism, "the true gist or sting of the *20 publications was not that [Global Relief] funded terrorism but that the government was investigating [Global Relief] for ties to terrorism and was considering blocking the group's assets." Id. at 983.
The Texas Supreme Court held in Neely that there is no rule stating absolutely that an accurately reported third-party allegation may not be actionable. See 418 S.W.3d at 64-65. In any event, we find that Global Relief is inapplicable because the allegedly defamatory statements at issue here went beyond mere "allegation reporting." In particular, the February 27, 2008 article stated that Carter's "bonus is based on financial performance" and its March 2 editorial stated unequivocally that the prior news reports had described "duplicitous dealings by Carter." The editorial stated that the removal of Hawley and Whitmore from the board "is nothing less than an attempt to intimidate critics of his conduct." The editorial's sub-headline-"Funds were shifted that made a loss look like a profit, entitling CEO to bonus"-clearly implied that Carter had engaged in improper conduct in order to benefit himself personally. Crucially, unlike the reporting in Global Relief , and unlike most of the other articles in this case, the March 2 editorial did not consistently attribute the allegations to a third-party source. Although the editorial explained that the allegations had initially been made by Bentley, its "gist or sting" was that the allegations were, in fact, true. Accordingly, the articles were not merely reports of allegations as in Global Relief . See 390 F.3d 973, at 983.
Because appellants have failed to conclusively prove that the "gist" of the articles is substantially true, a jury must be permitted to determine the issue of substantial truth, and summary judgment on these grounds would be improper. See Neely , 418 S.W.3d at 66. Appellants' third and fourth issues are overruled.
3. Non-Actionable Opinion
Appellants argue by their fifth and sixth issues that the statements at issue are non-actionable opinion. To distinguish between an actionable statement of fact and a constitutionally protected expression of opinion, we focus on the statement's verifiability and the entire context in which it was made. Bentley v. Bunton , 94 S.W.3d 561, 581 (Tex. 2002). Merely couching a statement as an "opinion" does not mean it is constitutionally protected. See Milkovich v. Lorain Journal Co. , 497 U.S. 1, 18, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990). As the United States Supreme Court explained:
If a speaker says, "In my opinion John Jones is a liar," he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications; and the statement, "In my opinion Jones is a liar," can cause as much damage to reputation as the statement, "Jones is a liar."
Id. at 18-19.
Appellants contend in particular that references in the March 2 editorial to Carter's "highly questionable stewardship of the financial affairs of the chamber," "intimidation, secrecy and duplicity," attempts to bring "transparency and accountability" to the Chamber and a "question mark" over Carter are constitutionally protected opinions, not statement of facts. Again, we disagree. Although certain parts of the editorial may be fairly *21 characterized as opinions, those opinions were supplemental to the underlying factual allegations. For example, though it may be appellants' opinion that Carter's practices as CEO were "highly questionable," that opinion was based on concrete, verifiable factual allegations, set forth elsewhere in the same editorial and supported by prior reporting, regarding the illicit "shifting of funds" used to falsely show a profit for the Chamber and thereby entitle Carter to a performance bonus. The fact that the editorial was couched as an "opinion" piece-and contained a disclaimer noting that "[t]he business side of the newspaper and the opinions expressed in this editorial page are separate"-does not mean it is necessarily constitutionally protected. See ids="6212323" index="50" url="https://cite.case.law/us/497/1/#p18">id. Instead, we conclude that the articles, taken as a whole, are statements of fact, and we overrule appellants' fifth and sixth issues.
4. Fair Report Privilege
By their seventh and eighth issues, appellants argue that the March 19, March 20, May 28,[12] and May 31, 2008 articles are privileged fair reports of judicial proceedings. At common law, the fair report privilege is a defense to defamation that protects the publication of defamatory matter concerning another in a report of an official action or proceeding "if the report is accurate and complete or a fair abridgement of the occurrence reported." Freedom Commc'ns, Inc. v. Coronado , 296 S.W.3d 790, 798 (Tex. App.-Corpus Christi 2009), vacated on other grounds , 372 S.W.3d 621 (Tex. 2012). "So long as the publication fairly and accurately reports the contents of the law enforcement statement without embellishment, the publication is privileged, even if the underlying facts being reported on are untrue or defamatory." Freedom Commc'ns, Inc. , 296 S.W.3d at 798 (citing Goss v. Houston Cmty. Newspapers , 252 S.W.3d 652, 655 (Tex. App.-Houston [14th Dist.] 2008, no pet.) ). The privilege is codified in section 73.002 of the civil practice and remedies code, which applies to "a fair, true, and impartial account" of a public judicial proceeding or other proceeding "to administer the law," or "reasonable and fair comment on or criticism of an official act of a public official or other matter of public concern published for general information." TEX. CIV. PRAC. & REM. CODE ANN. § 73.002 (West, Westlaw through 2015 R.S.).
In response, Carter notes that appellants only "quote[ ] a few sentences from each" of the March 19, March 20, May 28, and May 31, 2008 publications, and Carter argues that appellants instead "must show that the privilege applies to the publications as a whole" but they have "not even attempted to do so." Carter cites no authority for the proposition that the fair report privilege may not apply to individual articles. We have examined the articles at issue and conclude that, on the whole, the March 19, March 20, and May 28 articles appear to be "fair, true, and impartial account[s]" of proceedings in the lawsuit brought by Bentley and the instant defamation suit brought by Carter. See id. Accordingly, these particular articles are protected by the fair report privilege and the trial court erred in denying summary judgment in this regard.
The May 31, 2008 article, however, described the audio recording of the February 15, 2008 executive board meeting obtained by the Caller-Times and does not fall within the common law or statutory fair report privilege. See id. ;
*22 Freedom Commc'ns, Inc. , 296 S.W.3d at 798. Therefore, summary judgment would have been improper as to the May 31, 2008 article.
Appellants' seventh and eighth issues are sustained in part and overruled in part.
5. Negligence and Actual Malice
By their ninth and tenth issues, appellants argue that the articles at issue were published without negligence, and by their eleventh and twelfth issues, they contend that the articles were published without actual malice.[13]
For the purposes of defamation liability, a publisher is negligent if it knew or should have known a defamatory statement was false. Neely , 418 S.W.3d at 72 (citing Foster v. Laredo Newspapers, Inc. , 541 S.W.2d 809, 820 (Tex. 1976) ). "Actual malice" in a defamation case is a term of art-unlike common-law malice, it does not include ill-will, spite, or evil motive. Huckabee v. Time Warner Entm't Co. , 19 S.W.3d 413, 420 (Tex. 2000) ; see Greer v. Abraham , 489 S.W.3d 440, 443 (Tex. 2016) ; Waste Mgmt. of Tex., Inc. v. Tex. Disposal Sys. Landfill, Inc. , 434 S.W.3d 142, 157 (Tex. 2014). To establish actual malice, a plaintiff must prove that the defendant made the statement with knowledge that it was false or with reckless disregard of whether it was true or not. Greer , 489 S.W.3d at 443. "Reckless disregard" is also a term of art. Huckabee , 19 S.W.3d at 420.
Reckless disregard ... is a subjective standard that focus[es] on the conduct and state of mind of the defendant. It requires more than a departure from reasonably prudent conduct. Mere negligence is not enough. There must be evidence that the defendant in fact entertained serious doubts as to the truth of his publication, [or] evidence that the defendant actually had a high degree of awareness of the probable falsity of his statements.
Bentley , 94 S.W.3d at 591 (quotations and footnotes omitted). To prevail at trial, a plaintiff must establish actual malice by clear and convincing evidence. Huckabee , 19 S.W.3d at 420.
Appellants contend that the record "disproves" negligence because "the Caller-Times acted reasonably in checking the truth of the articles before publication" and because the articles were published "in accord with standard journalistic practices and customs." They refer principally to an analysis by Tony Pederson, a former editor of the Houston Chronicle and professor of journalism at Southern Methodist University. In his report, which was part of the summary judgment record, Pederson stated that the newspaper was justified in publishing a statement that Carter's "bonus is linked to the Chamber's financial performance" because that was *23 the explicit understanding of Bentley, Hawley, and Whitmore. According to Pederson, "[t]he fact that the issue was raised by [Bentley] in an email that was disseminated to the chamber's board creates a newsworthy issue that justifies publication." As to the newspaper's reporting that Carter "seized" the audio recording of the February 15 meeting, Pederson opined that, although Carter "may well complain about the word 'seized,' " which is "a strong word" and may "connote a decisive and perhaps even an aggressive action," the reporting on the issue is nevertheless "substantially true." As to the newspaper's reporting that Carter "shifted funds," Pederson stated that "Carter is certainly within his rights to complain about verb usage by both Bentley and the headline writers of the Caller-Times " but "the paper's coverage of the controversy seems to reflect accurately the complaints brought by the chamber treasurer and apparently shared by a number of others." Pederson additionally stated that, in reporting that Carter had "shouted" at the February 15 meeting, Aguilar "followed solid journalistic practices in referencing a reliable witness who was present during the event."
In conclusion, Pederson stated:
In examining the 25 articles specified in the complaint, there is nothing that stands out as lacking in conformance with journalistic standards or professionalism. Was there published criticism of Terry Carter? Yes. Did some of the criticism seem harsh? Yes. Was the reporting, writing and editing of the stories flawless? No, but then few news organizations can produce sustained coverage of a major issue such as this without a few minor errors. Did the newspaper form an opinion on the matter in the editorial published March 2? Yes, and that opinion was certainly critical of Carter, suggesting that the chamber get rid of him and move on. The newspaper was absolutely within its right to have and publish such an opinion. But the line between the news operation and the opinion side of the newspaper was maintained.
There was nothing of a personal nature in the criticism of Carter. There was nothing that could be construed as "vitriolic" ... All of the components of Carter's complaint deal directly with matters the newspaper reported in regard to his performance as president and CEO of the chamber. The newspaper was absolutely within its right to pursue news and information relating to a high-profile organization that is arguably quasi-public and an important component of any city the size of Corpus Christi. The sources for the stories that were used by the newspaper were all reasonable people with standing in the community. They had attained leadership positions in the chamber. The questions they raised seemed legitimate and related directly to their responsibilities in the chamber and were not of a personal nature. There is nothing in the record to indicate that any of the sources quoted by the newspaper believe they were misquoted or in any way misrepresented by the newspaper. In fact, the primary sources have testified that the paper correctly published their quotes and written materials. Finally, there is nothing in the stories or the record to indicate that any of the sources for the articles were operating in bad faith.
Given the circumstances, the newsworthiness of the narrative and the solid sourcing that was available, the Caller Times would have [been] derelict in its duty as the primary newspaper in Corpus Christi not to have reported this story in the 24 news articles and one editorial that are part of the record.
*24 From the materials I have reviewed, based on my training, education and experience, I conclude that the Caller Times articles in this case were reported, written and published in accordance with sound journalistic standards, practices and ethics.
In response, Carter argues that appellants acted recklessly or negligently because the sources upon which the articles relied were either indirect or unreliable. He contends that Whitmore was not a reliable source because, although she was quoted as having "confirmed" Bentley's assertion that Carter's bonus was based on the Chamber's financial performance, she had never personally reviewed Carter's contract and was merely reiterating what Bentley had told her. Carter notes that the Caller-Times reporters never sought a copy of Carter's amended 2007 contract but instead relied on Bentley's inaccurate description of that contract. Carter further argues that the newspaper never reported that Bentley had "consistently approved Carter's detailed monthly financial reports until January 2008."
Additionally, Carter argues that Birmingham's February 10, 2008 email, in which he complained about the appearance of a photograph of Carter on the front page of the newspaper's Sunday supplement, is evidence of Birmingham's "personal animus" toward Carter and evidence that he "held [a] personal grudge" against him. Carter further notes that Birmingham, who was a member of the Caller-Times editorial board, was also a member of the Chamber's board of directors and was therefore in a position to know that, under the contract applicable to the years in question, Carter's bonus was not dependent on the financial performance of the Chamber.
Finally, Carter argues that the Caller-Times should have known that Bentley was an unreliable source because he was previously "involved in a scandal that could have affected the public's perception of his trustworthiness." Specifically, Carter notes that, according to Bentley's deposition testimony, he was embroiled in a widely-reported controversy in 2007 involving his girlfriend, Lyndie Sikes, and his business partner, Mauricio Celis. According to a Caller-Times article dated October 26, 2007, which was included as part of Carter's summary judgment evidence, Sikes was found by police running away naked over a mile away from Celis's house. The article stated that Celis had shown a badge purporting to be a police officer's badge and had told another police officer that he was going to take custody of the woman, but the other officer refused. The article stated that: "The woman had been drinking that night with Celis and another male friend. The three had climbed naked into Celis' hot tub. The other man apparently tried to have sex with the woman, causing her to flee the house." The article did not identify "the other man." Carter posits that this is evidence that the Caller-Times "withheld ... Bentley's name from the public, with no explanation, even though the scandal could bear on the public's perception of Bentley's integrity" and that it shows "favoritism" by the Caller-Times toward Bentley.
We conclude that there is more than a scintilla of evidence that, in publishing the statements at issue, appellants knew or should have known that the statements were false. See Neely , 418 S.W.3d at 72. Pederson's analysis may constitute evidence that appellants exercised the proper standard of care in their reporting on the events at issue, but Carter produced evidence that the reporters did not seek to examine Carter's 2007 employment contract, which would have revealed that his bonus was not dependent on the Chamber's *25 financial performance. The reporters also did not seek to obtain the Chamber's accounting policies and procedures document, which would have revealed that the organization was operating on a modified accrual basis of accounting. Moreover, evidence that Birmingham was a member of the Chamber's board of directors could lead a jury to reasonably infer that he should have known these facts. Appellants' ninth and tenth issues are therefore overruled.
We do not, however, find a scintilla of evidence showing that appellants "in fact entertained serious doubts as to the truth" of the statements at issue. See Bentley , 94 S.W.3d at 591. The evidence-specifically, Birmingham's February 10, 2008 email and Carter's testimony that Birmingham warned him not to "mess with the man who buys ink by the barrel"-established that Birmingham harbored ill will toward Carter. But ill will is not included in the definition of malice in the defamation context. See id. at 590 (noting that, in the defamation context, "[t]he phrase 'actual malice' is unfortunately confusing in that it has nothing to do with bad motive or ill will' ") (citing Harte-Hanks Commc'ns, Inc. v. Connaughton , 491 U.S. 657, 666 n.7, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989) ). Carter has not produced evidence from which a reasonable trier of fact could infer that Caller-Times reporters subjectively knew that their reports were false, that they in fact "entertained serious doubts" about the truth of their publication, or that they "actually had a high degree of awareness of the probable falsity" of the statements at issue. See ids="6218419" index="73" url="https://cite.case.law/us/491/657/">id.
Carter notes that the United States Supreme Court has held that "recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." St. Amant v. Thompson , 390 U.S. 727, 732, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968). He contends that evidence of Bentley's controversial past supports a finding that appellants should have known that his claims were questionable. But Bentley's alleged misdeeds in a wholly unrelated context do not constitute an obvious reason for reporters to have doubted the veracity of his claims regarding the financial affairs of the Chamber.
"A failure to investigate fully is not evidence of actual malice; a purposeful avoidance of the truth is." Bentley , 94 S.W.3d at 596. In this case, we believe the summary judgment evidence can reasonably support a finding of the former, but not the latter. Accordingly, the trial court should have granted summary judgment on Carter's claim for exemplary damages based on actual malice. We sustain appellants' eleventh and twelfth issues.
6. Non-Defamation Claims
In addition to defamation, Carter's live petition raised claims of conspiracy, breach of fiduciary duty and breach of agreement against appellants. By their thirteenth and fourteenth issues, appellants contend that the trial court should have rendered summary judgment in their favor on these claims. Civil conspiracy requires (1) two or more persons who agree upon an object, (2) a meeting of minds on the object to be accomplished, and (3) one or more overt, unlawful acts committed in furtherance of the conspiracy, (4) which results in damages. Hicks v. Group & Pension Administrators, Inc. , 473 S.W.3d 518, 532 (Tex. App.-Corpus Christi 2015, no pet.).
Carter's conspiracy claim alleged that appellants combined with the Chamber, Bentley, Hawley, Whitmore, and others to defame Carter and to tortiously interfere with his contract with the Chamber. In response, Carter points to evidence that *26 Birmingham met privately with Hawley, Whitmore and other board members sometime after the Caller-Times withdrew from the Chamber. Birmingham testified that "there was a general consensus at the meeting" and that the attendees "acknowledged and recognized the concerns that I had." Birmingham did not testify as to the precise substance of the "consensus" at the meeting but he referred to "specific concerns about the way Mr. Carter was treating one of my reporters, as well as how he was referring to my company." Birmingham stated that Aguilar, the Caller-Times business reporter, was "dressed down publicly" by Carter at a press conference involving the Crosstown Commons proposal. Carter also points to evidence that Averyt told Birmingham that some members of the executive committee wanted Carter to be fired. He further notes that Caller-Times employees exchanged emails with the subject line "Terry Carter Watch for Resignation." Carter contends that the evidence shows that Whitmore, Hawley, and Bentley "repeatedly fed distorted, inaccurate, and false information and statements to the Caller-Times , which published it."
We disagree that the evidence supports a reasonable inference that appellants entered into a conspiracy to defame Carter or to interfere with his contractual relations. Birmingham's vague testimony regarding a "consensus" reached at a private meeting with Hawley and Whitmore establishes that they agreed as to "concerns" that he had with regard to Carter's performance as Chamber CEO, but it is not evidence that those individuals reached a "meeting of minds" regarding any action proposed to address those concerns. See ids="6837549" index="79" url="https://cite.case.law/sw3d/473/518/#p532">id. Similarly, evidence that certain unspecified executive committee members wanted Carter fired, or that Caller-Times employees suspected Carter might resign, does not support a finding that appellants entered into an agreement to defame Carter. Because there was no evidence to support Carter's conspiracy claims, the trial court should have granted appellants' summary judgment motion as to those claims. Moreover, Carter's summary judgment response does not mention or identify any evidence in support of his breach of fiduciary duty or breach of agreement claims. Therefore, the trial court should have granted appellants' summary judgment motion as to those claims as well. See TEX. R. CIV. P. 166a(i). We sustain appellants' thirteenth and fourteenth issues.
7. Publication by E.W. Scripps
Finally, by their fifteenth and sixteenth issues, appellants contend that the trial court erred by denying summary judgment on behalf of appellant E.W. Scripps because E.W. Scripps had "no involvement in publishing (or researching, preparing, writing, reviewing or editing) any of the articles" at issue.
Carter notes in response that it is undisputed that E.W. Scripps is the owner of the Caller-Times , and he argues that "[t]he owner of a media outlet is liable for the wrongful actions of that outlet, including publishing defamatory statements made by the outlet or republishing defamatory statements made by others." For that proposition, Carter cites only Zacchini v. Scripps-Howard Broadcasting, Inc. , in which the Ohio Supreme Court noted that the defendant owned a television station that broadcasted a report which allegedly constituted an invasion of privacy. 47 Ohio St.2d 224, 351 N.E.2d 454, 455 (1976), rev'd on other grounds , 433 U.S. 562, 578, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977). The case does not support the notion that the corporate owner of a media outlet is necessarily liable for all "wrongful actions" of its subsidiary, and we find no other such support.
*27 Carter additionally contends that E.W. Scripps has respondeat superior liability because Birmingham testified that he is an officer of E.W. Scripps. We disagree. Birmingham stated in his affidavit that he is an officer of "Scripps Texas Newspapers, LLC," an entity which does business as the Caller-Times and which is a wholly-owned subsidiary of E.W. Scripps. Carter has not pointed to any other evidence establishing the liability of E.W. Scripps. Therefore, summary judgment should have been granted on behalf of that appellant.
III. CONCLUSION
A free press is guaranteed by the Constitutions of the United States and of this State. See U.S. CONST. amend. I ; TEX. CONST. art. I, § 8. But that freedom comes with responsibility, and there are consequences for its abuse. See Pennekamp v. Florida , 328 U.S. 331, 356, 365, 66 S.Ct. 1029, 90 L.Ed. 1295 (1946) (Frankfurter, J., concurring) ("In plain English, freedom carries with it responsibility even for the press; freedom of the press is not a freedom from responsibility for its exercise.... Without such a lively sense of responsibility a free press may readily become a powerful instrument of injustice."); Ex parte Tucker , 110 Tex. 335, 220 S.W. 75, 76 (1920) (noting that the purpose of article I, section 8 of the Texas Constitution is to preserve freedom of speech and of the press "and at the same time hold all persons accountable to the law for the misuse of that liberty or freedom"). We are cognizant that the news media has an indispensable duty to inform the public of newsworthy events, and we do not intend, by our narrow holding in this case, to discourage the vigorous pursuit of truth that is essential to fulfilling this duty. Nevertheless, this case presents extremely unique circumstances-including the fact that Carter has already been held not to be a public figure, and that there is evidence the publisher personally harbored a grudge against him-which are unlikely to recur and which, in our view, show that summary judgment on all claims would be improper.
For the reasons set forth herein, we conclude that the March 19, March 20, and May 28, 2008 Caller-Times publications are protected by the fair report privilege; that there is no evidence of actual malice as to any publication; that there is no evidence supporting Carter's non-defamation claims; and that there is no evidence E.W. Scripps was involved in the publication of the allegedly defamatory articles. We further find that the remaining articles are defamatory per se statements of fact and that there are material fact issues as to substantial truth and negligence.
Accordingly, we reverse the trial court's denial of appellants' second summary judgment motion as to Carter's defamation claims regarding the March 19, March 20, and May 28, 2008 publications; as to Carter's claims for exemplary damages; and as to Carter's non-defamation claims. We render judgment granting the motion for summary judgment in favor of the Caller-Times as to those specific claims and in favor of E.W. Scripps on all claims. In all other respects, the trial court's denial of summary judgment is affirmed.

Carter also sued Judy Hawley, Sylvia Whitmore, Carol Scott, and Damon Bentley. The trial court denied their motions for summary judgment as well, and they were parties to the 2012 appeal. See Scripps Tex. Newspapers, LP v. Carter , No. 13-09-00655-CV, 2012 WL 5948955, at *1 (Tex. App.-Corpus Christi Nov. 21, 2012, pet. denied) (mem. op.). We reversed the trial court's denial of summary judgment as to Hawley, Whitmore, and Scott, and we rendered judgment in their favor. Id. at *7-8. We dismissed Bentley's appeal for want of prosecution. Id. at *1 n.1. Carter's live petition does not name any of these individuals as defendants, and none are parties to this appeal.

On November 10, 2015, Carter moved to dismiss this appeal, arguing that we lack jurisdiction under civil practice and remedies code section 51.014 because appellants did not raise the arguments made herein in their first summary judgment motion. We denied the motion on January 12, 2016.

The Hola front page contained a small photograph of Carter and his wife dancing at a social function and referred to an article in the supplement's "Inside Society" section. Birmingham's email to Averyt and Fitzgerald stated:
I have a lot tolerance for things one might describe as mistakes, but after looking at today's Hola front of section I can honestly say that you and Shane are either not paying attention to what goes in the paper or the editorial department has some sort of strange passion to simply piss me off. If it is the latter, mission accomplished!

Whitmore testified that Carter "got loud" and was "probabl[y]" yelling during his exchange with Bentley. Lucy Reta, a Chamber employee, testified that she heard Carter and another man "shouting."

Carter notes that the Chamber's Accounting Policies and Procedures document, dated June 3, 2006, states as follows: "Because a modified accrual basis of accounting is used, revenue is recognized in the accounting period in which payment is received." Bentley testified in deposition that he first received a copy of the Accounting Policies and Procedures document shortly after January 18, 2008.

According to the presentation, the Chamber invoiced the foundation for sixty percent of the Chamber's telephone and utility expenses and ten percent of the Chamber's office printing expenses between January and October of 2007.

The "$102,207 swing" comprises the $19,992 in "pay adjustment," $18,312 in "Building Fund adjustment," and $63,903 in "2008 Renewed Dues" adjustment.

Bentley's February 26, 2008 communication to the board appears in the record as an email. The parties refer to it as a letter.

The article specified that Martinez and Huseman had informed Hawley she was no longer on the board "because she was an appointee of the Port of Corpus Christi and the port did not contribute money to the chamber this year" and they told Whitmore "that she was no longer eligible because she is no longer immediate past chairman."

The editorial acknowledged that the Caller-Times had recently resigned from the Chamber but noted: "The business side of the newspaper and the opinions expressed in this editorial page space are separate."

In 2015, the Legislature amended section 73.005 of the civil practice and remedies code to add the following subsection (b): "In an action brought against a newspaper or other periodical or broadcaster, the defense described by Subsection (a) [providing that truth is a defense to a libel action] applies to an accurate reporting of allegations made by a third party regarding a matter of public concern." Tex. Civ. Prac. & Rem. Code Ann. § 73.005(b) (West, Westlaw through 2015 R.S.). However, even if Bentley's allegations were deemed as "regarding a matter of public concern," the statute does not apply to Carter's suit because the articles at issue were published before the statute's effective date. See Act of May 15, 2015, 84th Leg., R.S., ch. 191, § 2, 2015 Tex. Sess. Law Serv. ch. 191 (providing that the amendment "applies only to accurate reporting by a newspaper ... made on or after the effective date" of the enacting law, May 28, 2015, and that "[t]he accurate reporting by a newspaper ... made before the effective date of this Act is governed by the law applicable to the accurate reporting immediately before that date, and that law is continued in effect for that purpose").

In their brief, appellants refer to a May 29, 2008 publication; however, no article published on that date appears in the record. We assume that appellants intended to refer to the May 28, 2008 Caller-Times article.

We held in 2012 that Carter was not a public figure and therefore did not need to prove actual malice to support his defamation claim. Scripps Tex. Newspapers, LP v. Carter , No. 13-09-00655-CV, 2012 WL 5948955, at *1 (Tex. App.-Corpus Christi Nov. 21, 2012, pet. denied) (mem. op.). Nevertheless, he would still need to prove malice in order to obtain exemplary damages. See Tex. Civ. Prac. & Rem. Code Ann. § 41.003(a) (West, Westlaw through 2015 R.S.); see also Gertz v. Robert Welch, Inc. , 418 U.S. 323, 350, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) ("[T]he private defamation plaintiff who establishes liability under a less demanding standard than [knowledge of falsity or reckless disregard for the truth] may recover only such damages as are sufficient to compensate him for actual injury."). The parties appear to agree that, although malice is pleaded here only as a basis for exemplary damages and not as a necessary element of Carter's case-in-chief, the applicable definition of malice is the specialized definition used in the defamation context, not the definition generally used at common law.